# DEPARTMENT OF NATURAL RESOURCES v.
# ROGER ADAMS

[No. 858, September Term, 1976.]

*Decided September 8, 1977.*

The cause was argued before GILBERT, C. J. and MORTON and POWERS, JJ.

*Sharon K. Tucker, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *Warren K. Rich, Assistant Attorney General* on the brief, for appellant.

*Edward H. Nabb* and *Edward H. Nabb, Jr.,* with whom were *Harrington, Harrington & Nabb* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

It is inherent in our judicial system that review by an appellate court usually starts, not at the beginning of a case, but at the end, and, going backward from there, may result in the same ending, a new ending, or a new beginning.

One of the many unusual aspects of this duck blind controversy now under review is that we start in the middle and go in both directions. This wide ranging process leads us to conclude that the order appealed from, entered by Judge Daniel T. Prettyman in the Circuit Court for Dorchester County, was correct, and should be affirmed.

### The Dispute

The dispute arose over the right to locate a stationary blind for hunting wild waterfowl in the waters of Dorchester County. The judicial phase of this case was initiated in the circuit court when Roger Adams, who is the appellee here, filed, on 10 January 1975, an Order for Appeal from an Opinion and Order of the Board of Review of the Department of Natural Resources. The Board of Review had, on 17 December 1974, upheld a determination made on 19 August 1974 by James B. Coulter, the Secretary of the Department. The Secretary's determination had approved and reconfirmed an allocation among four applicants, made by a predecessor agency in 1967, of five locations for stationary duck blinds along the statutory Mills Point-Weir Point line, then defined in Code, Art. 66C, § 157 (c).

Roger Adams is the son and successor to the riparian interests of Claude Adams, one of the original applicants to whom a location for a stationary blind had been assigned in 1967. In May 1974, Adams asked the Department to review the assignment of the blind location to Thomas

Merryweather and Carroll Thomas,[1] contending that it was illegal, that it deprived Adams of his rights as a riparian owner, and that Thomas was not entitled to a blind in that area. In a letter responding to the request, the Secretary advised the attorney for Adams that the Department would undertake a complete review of the location of duck blinds in the area. The departmental review was undertaken. Upon the report submitted to him, the Secretary made his determination of 19 August 1974, which was appealed by Adams to the Board of Review, and then to the circuit court.

Various papers, documents, exhibits, opinions, and other material constituting the record of the administrative proceedings within the Department were ultimately filed in the circuit court. Counsel for each side filed a written memorandum, and the case was set for hearing. At the hearing, held on 17 June 1976, the issues were submitted on oral argument. The Opinion and Order of Court, filed on 23 July 1976, reversed the order of the Board of Review of the Department of Natural Resources, and remanded the proceedings to the Board for an order consistent with the Opinion. The Department of Natural Resources appealed.

### The Issue

The Department, possibly oversimplifying, states in its brief that the appeal presents one issue, which is:

"Whether the provisions of Title 10, Subtitle 6 of the Natural Resources Article authorize the Secretary to assign an owner of shoreline along Covey Creek a stationary blind site along the Mills Point-Weir Point line."

Adams, on the other hand, suggests in his brief that he may be oversimplifying by listing only 10 questions presented in

---

1. We shall refer hereafter to the "Thomas blind" or the "Thomas property". It appears that originally Merryweather and Carroll Thomas combined their claimed riparian ownership to support one application. Such combining of shoreline is permitted under the law. It appears also that the claimed qualifying shoreline is now owned by Henry Thomas, who leases the hunting rights to Merryweather.

this appeal. Our ultimate answer of "No" to the Department's single question will suffice for all.

## The Locale

To understand the factual review we now undertake, one must understand the locale and the law. The locale is in the northwesterly part of Dorchester County. We shall speak of three bodies of water, Trippe's Bay,[2] and two smaller bodies, Brannock's Bay[3] and Covey Creek, which border Trippe's Bay on the east. Brannock's Bay, to the south, and Covey Creek, to the north, are separated from each other by a peninsula or neck of land. All three have been separately recognized on maps for more than 100 years.[4]

For a graphic description of the locale, we attach as Appendix "A" to this opinion a copy of one of the exhibits in the record, with the names of certain identified owners added. It shows the shoreline of the three bodies of water, and shows also a delineation of the statutory Mills Point-Weir Point line, the line which generated this dispute.

---

2. Trippe's (sometimes Trippe) Bay is named for Lieutenant Colonel Henry Trippe, who fought in Flanders under William of Orange. Son of the Reverend Thos. Trippe of Canterbury, County Kent, England, Trippe, in 1663, at the age of 31, came to the Province of Maryland, and located between the Great Choptank River and the Little Choptank River, on the bay which has been called Trippe Bay since the days of the earliest cartographers. E. Jones, *New Revised History of Dorchester County* 473 (1966).

3. Although not documented as having given their name to Brannock's (or Brannock) Bay, the Brannock family, like the Trippes, were among the earliest settlers of Dorchester County, and undoubtedly were the source for the bay's name. The early county records show that Edward Brannock was appointed to a commission "to purchase land and lay out towns" and which was "required to meet before the 28th of March, 1684". Another Brannock, John, appears on the court records of 1 August 1690. E. Jones, *supra*, 52, 56.

4. Coast and Geodetic Survey, Natural Oyster Bars Maryland Chart No. 15, (1961); Maryland Geological Survey, Historical Shorelines and Erosion Rates for the Lower Eastern Shore (1975) (map dated 1942); United States Department of Interior Geological Survey, Maryland Sharps Island Quadrangle (June 1904 edition reprinted 1944); S. Martenet, H. Walling & O. Gray, New Topographical Atlas of the State of Maryland and District of Columbia (1873) (on this map Brannock Bay is referred to as Brannack's Bay). Some older maps show names for Brannock's Bay and Trippe's Bay, but not for Covey Creek. W. Dilworth, Map of Talbot County (1858); Lake, Griffey & Stevenson, Atlas of Talbot and Dorchester Counties Maryland (1877).

## The Statutes

The law at the time of the 1967 allocation was found in Code, Art. 66C, § 149-165. The law now appears in the Natural Resources Art., Title 10, Subtitle 6, §§ 10-601 to 10-623. The only difference significant to this case was the treatment of the subsection which established the Mills Point-Weir Point line. That difference does not affect our holding.

Subtitle 6, dealing with the hunting of wild waterfowl, contains many provisions of local application only, and many general provisions not relevant to the issues in this case. We have excerpted and paraphrased certain provisions found in the subtitle. Not all are relevant to our decision in this case. Some are included only to provide a brief explanation of the blind licensing process. With each statement of the law is a reference to the section in the present Natural Resources Article where the full statutory language may be found.

A "blind site" is a specific location in the water where a person may hunt wild waterfowl from a boat or raft tied to or anchored at a stake and is not a permanent structure. § 10-601 (b).

A "stationary blind" is a permanent offshore structure built on piling or stakes and used for hunting wild waterfowl. § 10-601 (f). The word "site" is often used to refer to the authorized location for a stationary blind.

A license is required for a blind site, and a license is required for a stationary blind. Either license is obtained, upon proper application, from the clerk of the circuit court of the county. § 10-612 (b), (d), (e).

A blind license is separate from and has no relation to a hunter's license, which must be possessed by any person hunting wild waterfowl from a stationary blind or blind site. § 10-613, § 10-301.

A license for a stationary blind or for a blind site, *in the water in front of riparian property* shall be issued to the owner (or to his lessee, licensee, or assignee) of riparian property of not less than 500 yards of shoreline (or, for a

stationary blind, but not for a blind site, less than 500 yards, with written permission of other shoreowners, so as to make a continuous shoreline of not less than 500 yards), if application for the license is made before October 11 of each year. § 10-612 (a) (1) (2), (d) (2). Certifications of ownership and of the amount of shoreline must be submitted with the application. § 10-612 (d) (1).

Other subsections of § 10-612 relate to licenses for blind sites, with which we are not directly concerned in this case.[5]

A person who receives a license for a stationary blind (or for a blind site) may, within the restrictions of the law, choose the location for his blind. He shall mark the position by erecting a stake showing the licensee's name and number. § 10-615 (a).[6]

Three other sections of the subtitle govern the location of a blind. They prescribe the permitted or required distances from the projected line of an adjoining owner, § 10-616, from other blinds, § 10-617, and from the shoreline, § 10-618. A blind may not be placed closer than 250 yards to the projected line of an adjoining owner, without his consent, § 10-616 (b), nor less than 500 yards from the

---

**5.** Those subsections permit riparian owners of less than 500 yards, or their lessees, licensees, or assignees, to apply, from October 11 through October 21, for a blind site at a location not in conflict with a previously licensed stationary blind or blind site. § 10-612 (d) (3).

After October 21 any resident, regardless of riparian ownership, may apply for a license for a blind site at a location not in conflict with a previously licensed stationary blind or blind site. § 10-612 (d) (4).

Licenses for *blind sites*, applied for by persons owning less than the required shoreline, or none at all, as permitted by § 10-612 (d) (3) and (4) above, shall be issued in the order in which applications are received. § 10-612 (g).

It should be emphasized that this first-come, first-served rule applies only to *blind sites*, not to stationary blinds, and further, it applies only among persons whose applications are not based upon riparian ownership of 500 yards or more of shoreline. We note also that it does not apply to persons who are eligible to make application before October 11. The right to a stationary blind is not perpetual, but there need be no race to the courthouse. The right is exclusive to the riparian owner until October 11 of each year. After October 10, he may be precluded by the proximity of a subsequently licensed blind site.

**6.** It is interesting to note that § 10-614 requires the Department to inspect licensed blind sites, but not stationary blinds, upon request of the owner of the shore front property.

nearest licensed stationary blind or blind site. § 10-617 (a). On irregular shorelines where it is impossible to place blinds 500 yards apart, the Secretary may reduce these distance requirements, respectively, to not less than 150 yards and not less than 400 yards.[7] § 10-617 (a).

The last statutory distance requirement for blinds is stated in § 10-618 (a), which provides that a person may not erect or maintain a blind more than one third the distance from his shoreline to the opposite shore, or more than 300 yards from his shoreline, whichever is less. That provision is modified by several local exceptions. One of them, the root of the present controversy, effectively moves the 300 yard line, for riparian owners on Brannock's Bay and Trippe's Bay, as much as 1,000 yards farther out over the water, to the Mills Point-Weir Point line. This exception, now found in § 10-618 (e), reads:

> "*Exception for Brannock's Bay and Trippe's Bay in Dorchester County.* — In the waters of Brannock's Bay and Trippe's Bay in Dorchester County, a person may not erect or maintain a stationary blind or blind site beyond a line drawn from Mills Point in a northeastwardly direction to the southeast corner of what is known as the Great Flats and from there to what is known as Weir Point or Orchard Marsh."

---

7. The formula for projecting property lines over the water (to delineate "the water in front of riparian property", § 10-612 (b)) is prescribed in § 10-616 (a). From a property boundary at the water line, a straight line 200 yards long is projected in each direction, following the general contour of the shore. The angle at the junction of the two lines is divided equally by a line projected over the water. It is evident that the statutory formulae for locating blinds do not solve all problems.

If one riparian owner's two projected lines diverge, the farther he goes over the water, the greater his choice to locate a blind in front of his riparian property, unless one of his lines intersects the projected property line of a non-adjoining riparian owner at a point less than 300 yards from the shoreline of either. If this occurs, or if his lines converge, so that his choice of a location is increasingly limited, there may be trouble. He may ask the Secretary for relief, but the only relief that official is authorized to give him is to reduce the distance from his blind to the nearest blind to 400 yards, and to a neighbor's projected property line to 150 yards. The riparian owner may be required to locate closer to his own shoreline. The 300 yard rule is a maximum, not a minimum.

## The Facts

The 1967 assignment of blind locations along the Mills Point-Weir Point line was made by Mr. George Shields, then Director of the Department of Game and Inland Fish. The record reflects no indication of controversy at the time. It appears that only four persons (or groups of persons) who owned more than 500 yards of shoreline property east of the Mills Point-Weir Point line seriously contended for assignment of a location. They were Adams, Thomas, a Mr. Brohawn, and a Mr. Seward.

Shields calculated the length of shoreline owned by each without regard to the body of water on which it bordered. Adams had 7,500 feet, some on Trippe's Bay, some on Covey Creek. Thomas had 6,000 feet, all on Covey Creek. Brohawn had 10,000 feet, substantial portions of it on each of the three bodies of water. Seward had 2,700 feet, all on Brannock's Bay.

The length of the Mills Point-Weir Point line was approximately 2,500 yards, which would accommodate five blind locations. Beginning at the northerly end of the line, Shields assigned location No. 1 to Adams, No. 2 to Thomas, Nos. 3 and 4 to Brohawn, and No. 5 to Seward.

Presumably the clerk of the circuit court issued annual blind licenses according to these assignments, until the current dispute germinated in September 1973 when Merryweather notified the Natural Resources Police that someone was constructing a stationary blind too close to the Thomas site. Upon investigation, the Natural Resources Police ascertained that the reported blind was only 220 yards from the Thomas site, and that the constructor was Roger Adams. Since the location violated the 500 yard limitation of the law, the Superintendent instructed Adams to remove the construction from the site and to return the site to its 1967 placement. Otherwise, the blind would be closed to hunting. Adams refused, and later lodged his complaint with the Department.

## Conclusions

The words of the statutes which control the decision in this case are generally clear and free of doubt. It is indeed true that the statutory scheme regulating rights to duck blinds does not cover every conceivable set of circumstances which one might argue should have been covered, but the courts may not extend statutes to make them say what the legislature, by choice or oversight, did not say.

To the extent that we indulge in statutory construction, we observe the cardinal rule, which is to ascertain and carry out the real legislative intent. *Frericks v. General Motors Corp.*, 278 Md. 304, 363 A. 2d 460 (1976); *Baltimore Gas & Elec. Co. v. Board of County Comm'rs of Calvert County*, 278 Md. 26, 358 A. 2d 241 (1976); *Becker v. Crown Central Petroleum Corp.*, 26 Md. App. 596, 340 A. 2d 324 (1975). In ascertaining such an intent, words of the statute are deemed to be used in their ordinary and popular sense and the language to carry its natural and ordinary signification. *Comptroller of the Treasury v. The Mandel, Lee, Goldstein, Burch Re-election Committee*, 280 Md. 575, 374 A. 2d 1130 (1977); *Harden v. Mass Transit Administration*, 277 Md. 399, 354 A. 2d 817 (1976); *Whitt v. Dynan*, 20 Md. App. 148, 315 A. 2d 122 (1974).

A court may not add to a statute by judicial construction, nor lightly read into a statute by implication, a provision which the legislature did not see fit to include. *Department v. Greyhound*, 247 Md. 662, 234 A. 2d 255 (1967); *Amalgamated Ins. v. Helms*, 239 Md. 529, 212 A. 2d 311 (1965). Where a law is plain and unambiguous, free from all objection on constitutional grounds and enacted in an area clearly within the province of the legislature, courts have no power to set aside or evade its operation by forced or unreasonable construction.

It is evident that the legislature intended to permit the issuance of a license for a stationary blind only to certain riparian owners, and to them only for a blind in the water in front of their riparian property. None of the provisions relating to distance from shore, from other blinds, or from property dividing lines, indicates a different intent.

A riparian owner to a body of water is a person who owns property bordering on that water. In discussing riparian rights, a leading treatise states that:

"The owner of land contiguous to a navigable body of water acquires by virtue of that ownership certain rights — termed riparian rights — which include principally the right of access to the navigable waters; the right to build piers, wharves, docks, and other improvements to the line of navigation; the right to reclaim land; and the right to accretions to his lands. These rights do not depend upon ownership of the soil under water but upon lateral contact with the water. *It is a universal rule that for riparian rights to attach to a tract of land, the water must form a boundary of the tract.*" (Emphasis supplied.) 2 Shalowitz, *Shore and Sea Boundaries* 534 (1964).

*See generally* 1 R. Clark, *Waters and Water Rights,* §§ 4.3, 16.2, 53.3 (1967); Ditwiler, *Water Problems and Property Rights — An Economic Perspective,* 15 Nat. Resources J. 663, 667-669 (1975); Teclaff, *What You Have Always Wanted To Know About Riparian Rights, But Were Afraid To Ask,* 12 Nat. Resources J. 30 (1972); Note *Maryland's Wetlands: The Legal Quagmire,* 30 Md. L. Rev. 240, 243-250 (1970).

The Department of Natural Resources contends that the manner in which the Mills Point-Weir Point line is drawn shows an intent by the legislature to permit all shoreline property owners east of the line to be eligible for a stationary blind on the line. Appellant's brief states "[t]he fact that subsection (e) of Section 10-618 uniquely adopts a line in lieu of setting a uniform numerical distance from shore is evidence that the General Assembly contemplated the eligibility of any shoreline owner bordering on the waters east of and enclosed by the line for a site along the Mills Point-Weir Point line." We cannot agree with this contention.

More logically, the question is whether the legislature,

when it referred to "the waters of Brannock's Bay and Trippe's Bay", intended to include the waters of Covey Creek. For two reasons, we hold that it did not so intend. First, Covey Creek is in fact a separate body of water,[8] and second, it has a separate name.

We conclude that Covey Creek is a separate body of water by applying the headland to headland rule. Generally, the rule is applied in determining whether a bay is inland water or open sea; that is, whether it is a distinct body of water or an indentation in an irregular coastline. By analogy, we apply the rule here.

Shalowitz, in his treatise, writes:

> "In theory, the question whether a bay is intraterritorial or extraterritorial, that is, whether inland waters or open sea — would seem to depend upon the extent to which the waters penetrate into the land, or more precisely, upon the ratio of that penetration to the dimension of the entrance." 1 Shalowitz, *supra* 34.

Both the inland penetration of the waters of Covey Creek from its headlands, and the ratio of that penetration to its mouth, show that Covey Creek cannot be viewed as merely an irregular shoreline to Trippe's Bay. The Creek stretches over one half mile from its headlands to its eastern shore. This is much more than a mere indentation. Moreover, the

---

8. The actual boundaries of a creek or a bay, or any other body of inland water, are determined by using the headland to headland rule. In reference to this rule, Shalowitz writes:

"Both with respect to true bays and rivers, the line marking the seaward limit of inland waters is a headland-to-headland line. This is the general principle. But more specific rules are required. The problem of defining the actual limits of a body of water tributary to a larger body is not always a simple one. The solution lies in finding the exact place where the tributary waterway merges into the principal waterway. * * * In common usage, the word headland implies a land mass having considerable elevation, something that the navigator can see from offshore — a kind of landmark for him. However, in the context of the law of the sea, elevation is not a pertinent attribute. What is important are the relationships between land and water which lie in a horizontal plane. A headland can then be defined generally as the apex of a salient of the coast; the point of maximum extension of a portion of the land into the water; or a point on the shore at which there is an appreciable change in direction of the general trend of the coast." (Footnotes omitted) 1 Shalowitz, *supra* 63-64.

distance between the headlands is approximately half the distance of the penetration into the land, showing the penetration to be quite pronounced. Such a configuration permits no conclusion but that Covey Creek is a body of water separate from Trippe's Bay.

For more than one hundred years, published maps have shown Covey Creek by name as a separate body of water. It is separately shown and named on all of the maps and charts contained in the record in this case.

When the legislature enacted § 10-618 (e) in 1975 [9] it was fully aware that Brannock's Bay and Covey Creek are lesser bodies of water, both bordering Trippe's Bay on the east. It chose to legislate with respect to Trippe's Bay, the greater, and Brannock's Bay, one of the lesser bodies of water. It chose not to legislate with respect to Covey Creek. The failure to include Covey Creek must be taken as a purposeful exclusion. Inclusion of Brannock's Bay confirms the exclusion of Covey Creek.

The statute which created the Mills Point-Weir Point line simply has no relation to owners of shoreline riparian to the waters of Covey Creek. Although the exception is stated in prohibitory terms, it must be read as permissive to have any effect at all. The only effect which could have been intended is that — for owners of property riparian to the waters of Brannock's Bay and Trippe's Bay — the Mills Point-Weir Point line was substituted for the 300 yard line, fixing the maximum distance of a blind from the owner's shoreline.

Since the law requires that one be a riparian owner on a body of water in order to have a stationary blind in that water, and since the Mills Point-Weir Point line lies in the waters of Brannock's Bay and Trippe's Bay, we must conclude that only owners of property with riparian rights to Brannock's Bay and Trippe's Bay may secure licenses for a stationary blind in those waters.

---

**9.** We attach no significance to the fact that the exception, formerly Code, Art. 66C, § 157 (c), was placed elsewhere, and with different effect, in the 1973 Code Revision, and was not reenacted until 1975. The reenactment was in effect at the time of the order of the circuit court. If the exception, and the Mills Point-Weir Point line it establishes, were not in effect, neither Adams nor Thomas could have any rights in the disputed area.

The Department further contends that under certain conditions the laws vest sufficient discretion in the Secretary in the location of blinds to support the allocation which he determined to be equitable in this case. Under § 10-616 (e), when the property line projected over the water forms an angle of less than 90 degrees to the shoreline, "the Secretary may determine where any stationary blind or blind site may be placed pursuant to the provisions of § 10-617 (a)." Whatever the discretion given in § 10-616 (e), its exercise must be within the terms of § 10-617 (a). That section says, in part:

"On irregular shorelines in creeks, coves, bays, and indentations where it is impossible to place them 500 yards apart, the Secretary may permit a stationary blind and blind site to be placed not less than 400 yards apart nor less than 150 yards from the dividing line. Where circumstances require, the Secretary may designate the distances from the dividing line between properties with regard to the property rights of adjacent landowners."

Although the law grants the Secretary certain discretion in placing stationary blinds and blind sites, it may be exercised only within prescribed limits. He may designate the distance of a blind location from the dividing line between properties, by reducing that distance from 250 yards to not less than 150 yards, and from the nearest licensed blind, by reducing that distance from 500 yards to not less than 400 yards. He may not, under any circumstances, authorize the placing of a stationary blind *outside* the body of water upon which the applicant owns, or holds the rights of, riparian frontage.

We are not persuaded that the legislature intended to vest a broader discretion in the Secretary of the Department of Natural Resources. The duck blind laws are designed to protect and to give priority to riparian owners. To allow the Secretary, in his discretion, to place a blind in another body of water clearly infringes upon the riparian owners of that body of water. To permit that kind of infringement would

jeopardize the very foundation upon which the Maryland duck blind laws are established. It would be both inequitable and unreasonable to allow a person to acquire a less valuable piece of waterfront property and then permit the Secretary to give him the riparian rights of a landowner who owns a more valuable and desirable piece of waterfront property simply because the angle formed by the property dividing line is less than 90 degrees. Section 10-616 (e) provides for the equitable resolution of riparian rights in a body of water for the riparian landowners on *that* body of water, not for those who own property elsewhere.

When geography and the law say that an owner of Covey Creek shoreline may not be licensed to place a stationary blind on the Mills Point-Weir Point line, neither the Department of Natural Resources nor the courts may say otherwise. It follows from what we have said that the order of the Board of Review, and the Secretary's determination which it upheld, were based upon a mistake of law, and are illegal.

*Order of. the Circuit Court for*
*Dorchester County affirmed.*
*Appellant to pay costs.*