PRINCE GEORGE'S COUNTY, MARYLAND ET AL.*v.*
THE EQUITABLE TRUST COMPANY, INC.

[No. 193, September Term, 1979.]

*Decided December 6, 1979.*

The cause was argued before MOORE, LOWE and LISS, JJ.

*Steven M. Gilbert, Associate County Attorney for Prince George's County,* with whom were *Robert B. Ostrom, County Attorney,* and *Michael O. Connaughton, Deputy County Attorney,* on the brief, for appellants.

*Robert A. Manzi,* with whom was *Russell W. Shipley* on the brief, for appellee.

Liss, J., delivered the opinion of the Court.

This is an appeal from a final order reversing a decision to downzone appellee's property made by the County Council of Prince George's County, Maryland, sitting as the District Council for that part of the Maryland-Washington Regional District in Prince George's County.

On May 2, 1978, by Council Resolution 40-1978, the District Council adopted a Sectional Map Amendment for Planning Area 81A in the County. By this action, 12 acres of land owned by appellee, Equitable Trust Company, were downzoned from the C-1 (Local Commercial, Existing) zone to the R-80 (Single Family, Detached Residential) zone. Appellee filed an administrative appeal to the Circuit Court for Prince George's County, and by an order entered January 30, 1979, that court reversed the District Council's action as it affected appellee's land, finding that the District Council had no power to downzone such property.

The Council and Prince George's County, the respondents below, are the appellants herein, and Equitable Trust Company, Inc. is the appellee. In September 1974, the County Council of Prince George's County, Maryland, sitting as the District Council for the Maryland-Washington Regional District in Prince George's County, passed Council Resolution 93-1974, which directed the Maryland-National Capital Park and Planning Commission (the Commission) to prepare a proposed Sectional Map Amendment (SMA) for Planning Area 81A, known as Clinton-Tanglewood. This planning area, covering over 9500 acres, includes the properties which are the subject of this case — two lots totalling approximately 12 acres at the northwest corner of Chris-Mar Avenue and Old Branch Avenue in Clinton, Maryland.

The Equitable properties, acquired by it in 1977, had been zoned C-1 (Local Commercial, Existing) for many years prior to 1974. In 1977, during the final stages of the SMA process before the Planning Board, Equitable's 12 acres were subdivided into two lots. The smaller lot of approximately 0.8

acres fronting on Old Branch Avenue and a short distance north of the intersection with Chris-Mar Avenue was subdivided from the remainder of the land owned by Equitable for the purpose of instituting commercial retail development permissible under the C-1 zoning in effect at that time. The remaining lot of 11.2 acres was not developed for commercial use at any time before the Clinton-Tanglewood SMA was finally approved and is still mostly vacant and unimproved. Located on this lot are several residential and incidental structures none of which were used for commercial purposes.

During the SMA process before the District Council, Equitable was able to begin commercial development on the 0.8 acre lot on Old Branch Avenue. Early in 1978, Equitable entered into a contract to sell this property to A&R Builders, Inc. which is not a party in this case. On March 10, 1978, after there had been initial hearings on the Clinton-Tanglewood SMA before the District Council, Equitable and A&R applied for a building permit for a commercial structure on the 0.8 acre property. The permit was issued on April 26 after the final Council public hearing, and A&R was able to pour footings and partially construct the walls of its commercial building before May 2, the date of final SMA approval. There is some indication that the District Council was aware of Equitable's development activities at the time of the final SMA approval.

The chronology of the final stages of the Clinton-Tanglewood SMA process dates back to July, 1977, when the Planning Commission released a proposed SMA for public inspection. This "Public Release" designated the Equitable properties as Change M5 and recommended that they be rezoned from C-1 to R-80 (One-Family Detached, Residential). On September 28, 1977, the SMA as proposed in the "Public Release" was reviewed in public hearing before the Planning Board. At this hearing, Equitable's representative acknowledged to the Board that the properties were in a residential area. The Planning Board's final SMA proposal was transmitted to the District Council on November 29, 1977. In the final transmitted document, called the

"Technical Summary", the subject properties in Change M5 were recommended for rezoning from C-1 to R-80.

Public hearings before the District Council on the proposed SMA were held on February 28, March 1, and April 12, 1978. After the second hearing, Council Resolution 33-1978 was passed, in which the Equitable properties were proposed for rezoning from C-1 to C-A (Ancillary Commercial), R-T (Townhouse), and C-S-C (Commercial Shopping Center). These changes from the Planning Board's proposal, given in Amendments 38, 38-A, and 39 of CR-33-1978, were supported by Equitable's representatives. At the public hearing held on April 12, 1978, several residents of the area near the Equitable properties objected to the proposed amendments, and after the hearing, the Council reinstated the R-80 zoning the Planning Commission had recommended. And finally, on May 2, 1978, the Council, by Resolution CR-40-1978, adopted the final Clinton-Tanglewood SMA by which both the 0.8 acre parcel on which there had been partial commercial development and the remaining 11.2 acres were downzoned to R-80.

While the proceedings we have heretofore noted were occurring, Equitable and A&R Builders, on March 10, 1978, applied for a building permit/use and occupancy permit to construct a retail commercial structure on the 0.8 acre lot. That portion of the total ownership of Equitable had been subdivided with a final record plat being approved on April 21, 1978.

On April 26, 1978, Prince George's County issued a combination building permit/use and occupancy permit to Equitable and A&R Builders. Footings were poured on April 26 and 27. Inspection and approval followed on April 27. By May 2, the date of the adoption of the Clinton-Tanglewood SMA, not only had footings and foundations been constructed, but walls were at least partially erected. On May 2, 1978, the Prince George's Department of Licenses and Permits revoked the building permit for an alleged violation of the underground utility notice requirement. An appeal of this action was noted to the County Board of Administrative Appeals which, on May 12, 1978, found that the action of the

Department of Licenses was improper and ordered reinstatement of the permit. The appellants appealed to the Circuit Court for Prince George's County which affirmed the Board's decision on June 16, 1978. In the interim, Equitable had timely noted an appeal from the Council's action adopting CR-40-1978. After a hearing and argument, the trial judge ruled that the downzoning of Equitable's 12 acres of property by CR-40-1978 was invalid. It is from the order issued by the trial judge reaching this conclusion that this appeal was filed.

Appellants raise two issues to be decided by this appeal. They are:

I. Whether it was error for the lower court to equate the words "developed and utilized for the zoning applicable thereto" in the zoning ordinance with the "vested rights" concept from Maryland zoning cases?

II. Even if Equitable's partially-developed lot of 0.8 acres was protected from SMA rezoning by the zoning ordinance, were the remaining 11.2 acres also protected?

Appellee contends that before the adoption of the Sectional Map Amendment pursuant to Council Resolution 40-1978 by the District Council that it (Equitable) obtained a building permit and initiated substantial construction on the 0.8 acre portion of its 12 acre lot. Appellee asserts that it was protected from the downzoning action of the District Council which affected the appellee's total acreage by the pertinent provisions of the Prince George's County Code, Sec. 27-574.2 (b) which provides as follows: "Property that is developed and utilized for the zoning applicable thereto, and property zoned within five (5) years prior to the institution of the Sectional Map Amendment shall not be downzoned."

Appellee urges that its partial construction of a commercial building on the 0.8 acre parcel had the effect of preventing the rezoning of the 0.8 acre property from commercial to

residential and had the umbrella effect of also preventing the rezoning of the remainder of the entire tract.

The Sectional Map Amendment process in Prince George's County was adopted in order to provide a method to accomplish comprehensive rezoning of large planning areas. *See Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 376 A.2d 483, *cert. denied,* 434 U.S. 1067 (1978); *County Council v. District Land Corp.,* 274 Md. 691, 337 A.2d 712 (1975); *Scull v. Coleman,* 251 Md. 6, 246 A.2d 223 (1968); *Grooms v. LaVale Zoning Board,* 27 Md. App. 266, 340 A.2d 385 (1975). The process mandates an initial resolution from the District Council requiring the Maryland-National Capital Park and Planning Commission to prepare an SMA proposal for designated areas; a Commission study of the affected areas; and a "Public Release" document showing the Commission's rezoning proposal. The procedure also requires a public hearing before the Planning Board; the preparation of a final "Technical Summary" from the Planning Board to the District Council; public hearings before the District Council; and a final SMA adoption by the Council on one of its legislative days. By means of this process, the Council may implement the various county plans and policies to be incorporated with a previously adopted master plan which controls land development within the relevant planning areas. The entire process involving the Clinton-Tanglewood SMA spanned three and one-half years.

At trial, the lower court was required to construe the meaning of the words "developed and utilized" as used in the applicable section of the Prince George's County Code. In endeavoring to interpret the disputed terms, the court was confronted with a two-fold problem: (1) "developed" or "utilized" was not defined in the county code; and (2) the meanings to be ascribed to either of these terms as used in the code had not been expressly defined in any legal precedents in Maryland. The situation was further complicated because the District Council, in adopting this statute, had not in any way indicated at what point the property reached the stage of being "developed and utilized." The trial court in attempting to reach a conclusion as to the

intended meaning of the terms determined that it was reasonable to construe the statute in the light of the Maryland cases which spoke of the "vested rights" of property owners to be protected from downgrading or rezoning of their property.

Appellee urges that the trial court was entirely correct in utilizing the doctrine "vested rights" in reaching its conclusion as to the meaning of the controversial words "developed and utilized." That doctrine, which has a constitutional foundation, rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations. *See Washington Suburban Sanitary Commission v. T.K.U. Associates,* 281 Md. 1, 376 A.2d 505 (1977); *Rockville Fuel and Feed Co. v. Gaithersburg,* 266 Md. 117, 291 A.2d 672 (1972).

The constitutional prohibition in the Maryland and Federal Constitutions against the taking of private property for public purposes without compensation is the basis for the many decisions by our Court of Appeals which have held that once construction has proceeded substantially and amounts to more than mere grading or site preparation so as to put the neighborhood on notice that the construction toward the intended use has commenced, then the owner's right to complete and use the structure is constitutionally protected. *Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975); *Ross v. Montgomery County,* 252 Md. 497, 250 A.2d 635 (1969).

The general rule as to the rights which accrue to a property owner under the "vested rights" doctrine is found in 3 A. Rathkopf, Law of Zoning and Planning ch. 57-6.57-7 (3d ed. 1972), where it is stated:

> The majority rule, which can be synthesized from the multitudinous decisions in this area, may be stated as follows: A landowner will be held to have acquired a vested right to continue construction of

a building or structure and to initiate and continue a use despite a restriction contained in an ordinance where, prior to the effective date of the ordinance, in reliance upon a permit theretofore validly issued, he has, in good faith, made a substantial change of position in relation to the land, made substantial expenditures, or has incurred substantial obligations.

Appellants urge, however, that the protection of the landholder as to the actual use or construction on his property does not protect the owner in the zoning of his land, and that a property owner never acquires a constitutional right to a particular zoning classification under the theory of "vested" rights. The Court of Appeals said in *Steuart Petroleum Co. v. County Comm'rs,* 276 Md. 435, 347 A.2d 854 (1975), that:

a property owner has no vested right in an existing zoning classification, [citations omitted], [but] there may be circumstances under which a property owner may either acquire a vested right to continue construction under a validly issued permit or a right to assert an estoppel against the issuer of the permit.

Under the factual circumstances of this case, it appears from the record that there is essentially no dispute between appellants and appellee with respect to the 0.8 acre parcel of land. Equitable having obtained a lawful building permit and completed substantial construction has vested rights which cannot be taken away by amendment of the zoning regulations. Appellants concede the right of Equitable to continue its commercial construction on the 0.8 acre parcel to completion. As to that parcel, appellants contend the only issue is the *zoning* of the property rather than Equitable's right to complete and use its commercial building in what would amount to a non-conforming use. While we accept appellants' statement of the law that there is no constitutional right to a particular zoning classification, that principle is modified by the "developed and utilized" clause of

County Code 27-574.2 (b) which precluded the District Council from "downzoning" Equitable's property.

Appellants argue vigorously that even though Equitable has acquired vested rights to continue its construction on the 0.8 acre tract, Equitable is not entitled to the protection of the "developed and utilized" clause because it had not completed its construction before the adoption of the SMA resolution.

In interpreting the meaning of the "developed and utilized" clause, we are guided by the usual principles of statutory construction, as ordinances and statutes are construed under the same basic canons. *Mayor & City Council v. First Methodist Episcopal Church,* 134 Md. 593, 107 A. 351 (1919); *Prince George's County v. Bahrami,* 33 Md. App. 644, 365 A.2d 343 (1976). The cardinal principle, of course, is that the court is to carry out the actual intentions of the legislative body. *Schweitzer v. Brewer,* 280 Md. 430, 374 A.2d 347 (1977); *Baltimore Gas and Electric Co. v. County Comm'rs,* 278 Md. 26, 358 A.2d 241 (1976). This intention is first to be found in a statute's language, which is to be given its natural and ordinary signification. *Department of Natural Resources v. Adams,* 37 Md. App. 165, 377 A.2d 500 (1977); *see* 2A C. Sands, Sutherland Stat. Construction sec. 46.01 (1973). Where no ambiguity arises, a court will not look beyond the words of the statute, and "[the] court [will] not insert or omit words to make a statute express an intention not evidenced in its original form." *Police Comm'r v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007, 1011 (1977). And in applying statutes to cases, "[r]esults that are unreasonable, illogical, or inconsistent with common sense should be avoided whenever possible consistent with the statutory language." *Schweitzer v. Brewer, supra,* 280 Md. at 438-439, 374 A.2d at 352.

At the time the Clinton-Tanglewood SMA was approved, Equitable had done the following on its 12 acre tract: (1) subdivided the 0.8 parcel creating a second parcel of 11.2 acres; (2) performed preliminary grading and excavation work on the 0.8 acre parcel; (3) obtained a building permit for the 0.8 acre parcel; and (4) poured footings and partially erected a commercial structure on the smaller parcel. Appellants urge that this does not amount to the necessary

quantum of facts required to establish that the 0.8 parcel was "developed and utilized" prior to the approval of the SMA.

Black's Law Dictionary 538 (4th ed. 1968) defines "develop" to mean "[t]o bring, or attempt to bring to a state of fruition." The term "develop" connotes the act of converting a tract of land into an area suitable for residential or business uses. *Winkleman v. City of Tiburon,* 32 Cal. App. 3d 834, 843, 108 Cal. Rptr. 415 (1973). Webster's New Int'l Dictionary (2d ed. 1959) defines "develop" as "the conversion of raw land into an area suitable for residential or business uses."

Appellants suggest that the use of the past tense in the word "developed" means that Equitable's property was not protected from downzoning in an SMA before construction was completed and ready to use. We do not accept this interpretation of the District Council's intention in adopting County Code 27-574.2 (b). To accept this reading of the section contemplates an unseemly race to the finish line on the part of the property owner who must complete his building before a new SMA is adopted. The clause was obviously intended to protect the property owner who in good faith developed and utilized property subsequently included in an SMA downzoning. At least, so far as the 0.8 acre tract was concerned, Equitable had developed and utilized that tract when it obtained a valid permit to erect the commercial building authorized by the existing zoning and had made substantial progress on its completion. The definition of "utilized" as given in Webster's Dictionary, *supra,* substantiates this interpretation. There, "utilized" is defined as "to make useful; to turn to profitable account or use; to make use of."

We agree with the trial judge below that the 0.8 acre lot on which substantial construction had been completed prior to the passage of the Clinton-Tanglewood SMA was protected from downzoning. We do not, however, accept the trial court's conclusion that the word "property" as used in the applicable "developed and utilized" clause necessarily means all property in one ownership so that development of any portion precludes the rezoning of the remainder.

To reach such a conclusion on the facts in this case would,

we believe, require an unreasonable result obviously not contemplated within the legislative intention when the clause was adopted. In this case, the owner of the entire tract subdivided the 12 acre realty into two separate parcels. The development of the less than one acre parcel was undertaken without any perceivable nexus to the much larger parcel. There is no evidence to indicate the owner had even contemplated a use for the 11.2 acres. To accept the court's rationale would presuppose that the development of less than an acre in a tract of 1000 acres, for example, would protect the same owner of the adjacent land from the effects of downzoning. We believe that the strictures enunciated in *Schweitzer v. Brewer, supra,* are here applicable that "results that are unreasonable, illogical or inconsistent with common sense should be avoided wherever possible." 280 Md. at 438-39.

We conclude that the trial court was correct in its conclusion as to the 0.8 parcel, and that it erred in its finding that the SMA ordinance was inapplicable to the remaining 11.2 acre parcel.

*Judgment affirmed in part, reversed in part; costs to be divided between appellants and appellee.*