Vivian M. SCHELLER and Steven D. Tollstrup, Plaintiffs and Appellants,

v.

DIXIE SIX CORPORATION, Defendant and Respondent.

No. 860147–CA.

Court of Appeals of Utah.

April 25, 1988.

Walter P. Faber, Jr., Watkins & Faber, Salt Lake City, for plaintiffs and appellants.

Craig G. Adamson (argued), Mark A. Larsen, Lawrence K. Hurless, Dart, Adamson, and Parken, Salt Lake City, for defendant and respondent.

Before BILLINGS, GARFF, and ORME, JJ.

## OPINION

ORME, Judge:

Appellants Scheller and Tollstrup appeal from a judgment awarding defendant Dixie Six Corporation what they contend is an excessive distribution pursuant to a limited partnership agreement between the parties. We reverse in part and remand.

### Facts

Vivian Scheller and her son Steven Tollstrup ("Scheller"), owned approximately twenty-four acres of property in Salt Lake County which they intended to have developed to produce long-term income. In the spring of 1979, Mrs. Scheller approached Hal Larsen, an officer of Dixie Six Corporation, about working with her and her son to develop the property. On March 3, 1980, the parties formed a limited partnership known as D.S.T., Ltd., with Dixie Six as the general partner and Mrs. Scheller and her son as limited partners. Pursuant to the limited partnership agreement, Dixie Six contributed $10,000 toward the initial capital and Scheller conveyed the property to D.S.T.

The partnership agreement provided that the purpose of the partnership was to "subdivide, develop and market" the property. The words "subdivide, develop and market" were left undefined. The agreement contained a formula for the allocation of the partnership's receipts, which may be summarized as follows:

(a) First, to reimburse the actual expenses relative to the subdividing, de-

velopment, improvement and sale of the property,

(b) Second, to payment to the Limited Partners for the real property, calculated at $30,000 per acre.

(c) Third, one-half of the remainder to Dixie Six and one-half of the remainder to the Limited Partners.

In addition, the agreement provided that Dixie Six could charge the partnership a real estate commission not exceeding 6% of the sales price of the property and, further, that Dixie Six had the unqualified right to sell the property at any time.

Following the signing of the agreement, Dixie Six hired Western Design, which began preparing plans, plats, and studies, and sought governmental approval to build an apartment and commercial complex on the site.

In April 1981, D.S.T. sold 1.2 acres of the property to Marvin Hendrickson, an officer and shareholder in Dixie Six, for $36,000.00 and in February 1982, D.S.T. sold an additional 0.75 acres to Hendrickson. In both transactions, D.S.T. took no sales commission or other distribution and paid all of the proceeds to Scheller.

Once the plans for improvement on the site were completed in the fall of 1982, Dixie Six attempted to get financing for the project but was unsuccessful.[1] During this time, D.S.T. received an offer from P.F. West to purchase the remaining property. Dixie Six sought Scheller's consent to the proposed sale to P.F. West and Scheller consented, but the sale was never completed. Dixie Six subsequently discontinued its efforts to locate and obtain financing. Dixie Six then caused the remaining partnership property to be sold to Busch Development on June 30, 1983, for a sum in excess of $1.2 million.

Prior to the sale of the property, Dixie Six informed Scheller that it intended to divide the proceeds from the sale according to the formula set forth in the partnership

---

1. Articles IV and XIV of the agreement required Dixie Six, as one of its obligations, to obtain financing.

agreement.[2] Scheller objected to allocation of the proceeds on that basis. The sale was concluded without the allocation issue having been resolved. On September 23, 1983 Scheller filed suit in district court seeking a declaratory judgment limiting Dixie Six to the recovery of its expenses plus the 6% sales commission for the sale of the property and to prohibit Dixie Six from sharing in the profit of the sale as set forth in the partnership agreement.

The trial court found that the partnership agreement did not define the words "subdivide, develop, and market" and concluded that Dixie Six did not violate the agreement by selling the property. The court also concluded that Scheller was estopped from claiming that Dixie Six had not performed in accordance with the contract because Scheller had knowledge of, and in fact acquiesced and approved of, all sales of the property. In addition, the court found that it would be inequitable to allow Scheller to accept the efforts of Dixie Six without allowing Dixie Six to recover as provided in the contract. Since the parties had expressly provided no alternative method of compensating Dixie Six for its services, the court found the formula as set forth in the partnership agreement to be enforceable.

Scheller argues that Dixie Six was not entitled to a full share of the profits from the sale of the property because it sold the property without "developing" it as required by the agreement. Scheller acknowledges that, while Dixie Six had the unqualified right to sell the property at any time, a right Scheller contends was given primarily for tax purposes, it had the obligation to "subdivide, develop and market" the property. Thus, Dixie Six's right to share in the proceeds according to the formula set forth in the agreement was contingent upon its fulfilling its obligation to "subdivide, develop and market" the property.

The trial court did not reach the issue of the meaning of the term "develop" as used

in the agreement because it determined that Scheller was "estopped" from taking the position that Dixie Six had not performed as provided in the contract. We find Scheller's conduct does not constitute estoppel.

### Estoppel

■ The elements of estoppel are: "conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct." *Barnes v. Wood*, 750 P.2d 1226, 1230, (Utah Ct.App. 1988) (quoting *Blackhurst v. Transamerica Ins. Co.*, 699 P.2d 688, 691 (Utah 1985)). The trial court concluded that appellants were estopped from asserting that Dixie Six could not sell the property unless it was "developed" because Scheller had knowledge of, acquiesced in, and approved of the two minor sales of property to Marvin Hendrickson and the proposed sale to P.F. West, all without any development having taken place. However, the trial court's conclusion confuses Scheller's position concerning sale of the property with Scheller's position concerning the allocation of proceeds upon sale.

Scheller has not asserted that Dixie Six could not sell the property unless it was "developed" as anticipated under the agreement but only that Dixie Six was not entitled to a full share of the proceeds for the sale of property unless it satisfied its obligations under the contract. Scheller's approval of the first two sales of property do not constitute an estoppel from objecting to the allocation of proceeds from the Busch sale for two reasons. First, the earlier sales of property, combined, constituted only 1.95 acres out of the total 24 acres owned by D.S.T. and involved land that was never intended for development. Second, Dixie Six took no sales commissions on these transactions and paid all the proceeds to Scheller. Therefore, Scheller

---

2. In their complaint, Scheller also claimed that Dixie Six had demanded a commission of 19% rather than the 6% provided in the agreement.

had no reason to complain about the allocation of proceeds.

Nor can Scheller's approval of the proposed P.F. West sale form the basis of an estoppel from objecting to the allocation of proceeds from the Busch sale. The P.F. West sale was never completed and there were no proceeds to allocate. Thus, Scheller's failure to object to the allocation of proceeds from two sales in which Dixie Six took no proceeds and one proposed sale which never reached the point of allocation, is not conduct that could reasonably lead Dixie Six to believe that Scheller would not object to its claiming a full share of proceeds in the event of a consummated sale of undeveloped property. Any uncertainty in this regard was resolved when, nearly two months prior to closing of the Busch sale, Scheller's counsel wrote Dixie Six objecting to use of the agreement's formula for allocating sale proceeds if the property were sold undeveloped.

We hold that the trial court erred in concluding that Scheller was estopped by its own actions from asserting that Dixie Six did not perform as provided in the contract. Because the trial court decided the case on a theory of estoppel, it was not necessary for it to reach what we view as the pivotal issue in this case, namely the meaning of the term "develop" as used in the agreement. Since we find that Scheller's conduct did not give rise to an estoppel, the exact meaning of the term is critical.

### "Subdivide, Develop and Market"

■ Generally, the term "develop," when used in connection with real estate, is interpreted to mean "the converting of a tract of land into an area suitable for residential or business uses." *Prince George's County v. Equitable Trust Co., Inc.*, 44 Md.App. 272, 408 A.2d 737, 742 (1979). *Accord, Muirhead v. Pilot Properties, Inc.*, 258 So.2d 232, 233 (Miss.1972). Similarly, the word "developer," in common parlance, means "a person who develops real estate;

*often:* one that improves and subdivides land and builds and sells residential structures thereon." Webster's Third New International Dictionary 618 (1986).

The parties' agreement states in Article II that the purpose of the partnership is to "subdivide, develop, and market" the property. The use of these terms, or some variation, throughout the agreement, is consistent with the interpretation that "develop" means to build. For example, Article VI, with our emphasis, states as follows:

> In addition thereto, Dixie shall contribute its expertise for the purpose of subdividing, developing and marketing the property; shall provide or obtain all *equipment, machinery* and personnel necessary for such subdivision, development and marketing; and shall obtain the necessary and sufficient *financing* for such subdivision, development and marketing, *using the property as security* thereof.

Viewing the contract as a whole, we would have little difficulty in concluding, as a matter of law, that the term "develop" as used in this agreement means "build." [3] Equipment, machinery, and secured lending suggest construction, not the mere planning, surveying, studying, and appraising which Dixie Six contends satisfied the obligation to "develop" the property. However, even if there is some ambiguity concerning what the parties intended when using the term "develop," the evidence compels the conclusion that the parties intended to mean "build." The formula allocating a full 50% of the net proceeds to Dixie Six is itself indicative of that result. If all Scheller anticipated was the sale of the property, it would have hired a real estate agent and paid the standard real estate commission. Common sense dictates that one does not offer someone *half* of the net profit on the sale of property for simply serving as an agent to sell property.

More importantly, the prior discussions and negotiations between the parties and their course of conduct assumed actual

---

**3.** Assuming that "develop" means "build," uncertainty remains as to what was to be built: a church, a race track, homes, a laundromat, or even roadways, curbs, and gutters? Such uncertainty is inconsequential in adjudicating the parties' rights where nothing whatever was built.

building on the property. The trial court found that Dixie Six sought government approval for "the building of an apartment and commercial complex on the site." The court also found that prior to forming the partnership, the parties met on the site of the property and "discussed possible types and configurations of buildings which might fit on the land."

The parties' agreement contemplated the development of the property and did not anticipate the sale of the property undeveloped. Accordingly, the payment formula was premised on the sale of developed property. So certain were the parties that the property would be developed that they never contemplated a formula for the allocation of proceeds in the event of a sale of undeveloped property. Thus, there was simply no agreement between the parties as to the allocation of proceeds in the event that Dixie Six failed to develop the property as required by the agreement.

Absent a meeting of the minds on how to divide the proceeds in the event of sale without development, Dixie Six has no clear contractual right to recover anything in excess of the agreed commission and expense reimbursement. Nonetheless, Scheller concedes that Dixie Six may be entitled to some sort of equitable remedy.

### Quantum Meruit

The trial court, considering it had no alternative method of compensation, determined it had to either award Dixie Six no additional compensation whatsoever or a full 50% of the profit from the sale of the property. It chose the latter rather than leave Dixie Six uncompensated for its efforts. While we agree with the trial court that it would be unfair to allow Scheller to profit from the work done by Dixie Six in anticipation of development, we do not agree that the only alternative is to give Dixie Six a 50% share of the net proceeds from the sale.

When a party, for some reason, is not entitled by the express terms of a contract to recover payment for services rendered, he or she might nonetheless be entitled to recover in quantum meruit. *Davies v. Ol-son*, 746 P.2d 264, 268 (Utah Ct.App.1987). Recovery under quantum meruit presupposes that no enforceable contract exists. *Id.* In this case, while the parties entered into a contract, no contract existed as to the allocation of proceeds in the event the property was sold undeveloped.

Quantum meruit has two distinct branches, both rooted in justice to prevent one party's enrichment at the other's expense. *Id.* at 269. The first branch, contract implied in law or "quasi-contract," is really not a contract at all, but rather an action in restitution. *Id.* "The elements of a quasi-contract, or a contract implied in law are: (1) the defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Id.* Recovery under quasi-contract or contract implied in law is measured by the value of the benefit conferred on the defendant and not by the detriment incurred by the plaintiff or, necessarily, the reasonable value of the plaintiff's services. *Id.*

The second branch of quantum meruit, contract implied in fact, is an actual contract established by conduct. *Id.* The elements of a contract implied in fact are: (1) the defendant requested the plaintiff to perform the work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation. *Id.* Recovery in such cases is for the amount the parties can be said to have reasonably intended as the contract price. When the parties have left that amount unexpressed, courts will infer the amount to be the reasonable value of the plaintiff's services. *Id.*

▉ The conduct of the parties in this case established a contract implied in fact as to the allocation of proceeds if the property was sold prior to development. Scheller requested Dixie Six to perform the work of developing the property which necessarily involved the work of preparing plans, plats, and studies and securing governmental approval for construction on the site. Likewise, Dixie Six clearly expected

to be compensated for these services. Finally, Scheller knew or should have known that Dixie Six expected compensation for these services beyond the 6% sales commission it would receive for just selling the property.

It is reasonably clear that, in agreeing to the payment formula prescribed in the agreement, the parties contemplated that Dixie Six's 6% commission, a standard commission rate in the real estate industry, would compensate it for its efforts in marketing the property while the 50% share in the net profits would reward it for its efforts in subdividing and developing the property. Thus, if there had been a mere sale, 6% of the selling price would represent an appropriate allocation to Dixie Six. However, while it cannot be said that Dixie Six satisfied its obligation to develop the property, the trial court nonetheless found that Dixie Six had expended efforts which enhanced the property, including acquiring plans for development of the property and obtaining governmental approval for development in accordance with the plans. As explained above, Dixie Six is entitled to a recovery in quantum meruit for the reasonable value of its non-sale efforts.

Accordingly, we affirm the judgment insofar as it awards Dixie Six the reimbursement of its expenses and a sale commission of 6%. The judgment is reversed insofar as it also allowed Dixie Six 50% of the net sale profits, with remand for a determination of the amount of additional compensation to which Dixie Six is entitled under a theory of quantum meruit. The parties shall bear their own costs of appeal.

BILLINGS and GARFF, JJ., concur.