677 A.2d 102

The TOWN OF SYKESVILLE, et al.

v.

WEST SHORE COMMUNICATIONS, INC., et al.

No. 1452, Sept. Term, 1995.

Court of Special Appeals of Maryland.

June 3, 1996.

Cynthia K. Hitt, Dennis J. Hoover and Siskind, Grady, Rosen & Hoover, P.A., on the brief, Baltimore, for appellant, Sykesville.

Judith S. Stainbrook and Bourexis & Stainbrook, on the brief, Westminster, for appellant, Losada.

George A. Lahey and Beth Evans, on the brief, Westminster, for appellant, County Com'rs.

Clark R. Shaffer, Westminster, for appellees.

Argued before MOYLAN, BISHOP, and HARRELL, JJ.

MOYLAN, Judge.

■ This appeal requires us to examine in some depth the law of vested rights in the context of zoning. For a right to proceed with construction under existing zoning to vest, three conditions must be satisfied: 1) there must be the actual physical commencement of some significant and visible construction; 2) the commencement must be undertaken in good faith, to wit, with the intention to continue with the construction and to carry it through to completion; and 3) the commencement of construction must be pursuant to a validly issued building permit.

The Town of Sykesville ("the Town"), the County Commissioners of Carroll County, and Kathleen Blanco–Losada ("Blanco–Losada") have appealed the affirmance of two decisions of the Carroll County Board of Zoning Appeals (B.Z.A.) by the Circuit Court of Carroll County. The decisions of the B.Z.A. concerned a two hundred (200) foot communications tower ("the Tower") sought to be built by one of the appellees, West Shore Communications, Inc. ("West Shore"), near Hollenberry Road in Sykesville for the use of its fellow appellee, Cellular one. The first appeal to the B.Z.A. was filed by the

Town and by Blanco–Losada, a neighbor of West Shore's property, protesting the approval of the Site Plan for the Tower by the Carroll County Planning Commission ("Planning Commission.") That administrative appeal was heard by the B.Z.A. on October 26, 1994, at which time the Board orally denied the appeal. The B.Z.A. issued its written decision memorializing that denial of the appeal on November 22, 1994.

The second administrative appeal to the B.Z.A. was filed by West Shore and its chief operating officer, the appellee Mark Sapperstein, seeking reversal of the decision of the Carroll County Office of Inspections & Permits on October 31, 1994 to issue a stop work order on the construction of the Tower and the concurrent revocation of the appellees' building permit and zoning certificate. Both of those actions were taken immediately after the Carroll County Commissioners had enacted an ordinance that had the arguable effect of invalidating West Shore's Site Plan for the Tower. The B.Z.A. reversed those actions of the Office of Inspection and Permits on the ground that West Shore had acquired vested rights in its zoning certificate by engaging in substantial construction of the Tower prior to the revocation of its permits.

Both of those decisions of the B.Z.A. were appealed by the protestants of the project to the Circuit Court for Carroll County, which heard argument on the merits in a consolidated proceeding on April 21, 1995. The circuit court affirmed the B.Z.A.'s decision on the building permit revocation on the same substantive ground relied on by the B.Z.A., namely that West Shore had already acquired vested rights. The circuit court did not address the arguments presented by the Town and Blanco–Losada with respect to their appeal of the ultimate Site Plan approval by the B.Z.A.

There are in this case so many administrative actions by so many administrative agents and agencies, so many overlapping chronologies, and so many minor themes intertwined with the major themes that there is a real danger that the wheat will get lost in the chaff. As the appellants, especially, seek to replay every petty grievance that they feel they have

suffered over the long course of this litigation, there is the attendant danger that we will be lured into concerning ourselves with issues that are, in the present appellate posture of the case, none of our business or with issues that once may have been of grave concern to the parties but that no longer matter. Before we can begin to focus clearly on what must be decided, we must clear away a lot of debris. Let us first, however, set the factual picture.

### The Factual Background

In October, 1993, West Shore applied to the B.Z.A. for a conditional use permit and a building permit to construct the Tower. When the B.Z.A. conducted hearings regarding the request in January and February, 1994, the Town of Sykesville appeared in opposition to the request, as did neighboring property owners, who presented a petition with 600 to 700 signatures in opposition to the Tower. Nevertheless, the B.Z.A. approved the conditional use in a written decision dated March 31, 1994, subject to the requirement that West Shore obtain approval of its site development plan ("Site Plan") for the Tower from the Planning Commission.

Under then-existing law, the Planning Commission was authorized by Section 4.11 of the Carroll County Zoning Ordinance to approve site plans for free-standing towers. That section of the zoning ordinance conferred on the Planning Commission the discretion to require "a reasonable fall area," but it did not require the Planning Commission to do so. As a limitation on the exercise of that discretion, it provided that the "fall area *may* be as much as 100% of the tower height based upon reasonable safety considerations." (Emphasis supplied). Implicitly, the Planning Commission did not even possess the discretion to require a fall area in excess of 100% of the height of the Tower. In any event, this option was simply a discretionary one that the Planning Commission might impose.

In the face of the substantial opposition to this and other communications towers, the County Commissioners had draft-

ed an ordinance on June 15, 1994, that would have, among other requirements, specifically mandated that such towers contain "a minimum setback of a distance equaling the height of the tower." The new ordinance would have removed the discretion theretofore enjoyed by the Planning Commission to insist upon or to dispense with a "fall area" based on 100% of the tower height. The draft ordinance would have applied to "any pending applications for which the Zoning Administrator has not issued a certificate" at the time of enactment of the ordinance. Until the enactment of that ordinance on October 31, 1994, however, such a "fall area" requirement was nothing more than a legislative possibility that might or might not ever come to pass.

What we must not lose sight of is the fact that the merits of granting a conditional use for the erection of the Tower to West Shore were determined by the B.Z.A. on February 10, 1994, following lengthy hearings on January 27 and February 7. The eleven-page opinion of the B.Z.A., granting the conditional use, was filed on March 31. That opinion made detailed and elaborate findings of fact, discussed all applicable law, and fully spelled out the reasoning behind the unanimous decision of the B.Z.A. That granting of the conditional use set in motion the routine administrative follow-up procedures, the first of which was to obtain the approval of the Site Plan by the Planning Commission.

On August 16, 1994, the proposed West Shore Site Plan came before the Planning Commission for consideration. All five Planning Commissioners were present, including its chairman, Louis J. Pecoraro. As a practice, the chairman would vote only in the event of a tie. The Planning Commission's alternate member, David Duree, was also present and available to replace a member unable to act on a measure. The Planning Commission's staff noted that the 200–foot fall radius surrounding the tower penetrated the land of two off-site property owners, one of whom was the appellant Blanco–Losada. The developers stated that they were attempting to get permission of entry should the Tower fall onto those properties. The staff report recommended that approval of

the Site Plan be contingent on obtaining those permissions of entry.

The appellee Sapperstein, West Shore's chief operating officer, testified, however, that the off-site property owners were not cooperating in granting those approvals. He therefore requested that the Planning Commission, in its discretion, not impose a "fall area" requirement equal to 100% of the height of the proposed Tower. Ms. Blanco–Losada pointed out to the Planning Commission that such a 100% fall area requirement would be required according to the proposed legislation then under consideration by the County Commission. The Planning Commission nevertheless moved for a vote on the motion that the Site Plan be approved, provided "[t]hat no building permit or zoning certificate be issued until the Bureau of Development Review has received all agencies' approvals in writing and the site plan is finally approved."

That motion was approved by a vote of 2–1, thereby not imposing a requirement of a fall zone equal to 100% of the height of the Tower. Planning Commissioner Zeno Fisher abstained from the vote because of a perceived conflict of interest on his part. According to subsequent testimony before the B.Z.A. by alternate member Duree, prior practice would have allowed him to vote in place of a member with a conflict. Prior to the beginning of the session, however, the other members of the Commission had decided that Duree should not vote on any measures, presumably because all five voting members were present. Duree previously had indicated his opposition to the Tower; thus, had he voted in place of Fisher, it might be surmised that the Planning Commission would have been deadlocked, two to two. The Commission chairman, moreover, testified before the B.Z.A. that he would have voted against the motion in the event of a tie.[1] When

---

1. Without suggesting for a moment that we think the voting procedure used by the Planning Commission on that occasion is of any concern to us or should have been of any concern to either the circuit court or the B.Z.A., we notice a flaw in the logic of the appellants. They claim that the failure of one of the Commissioners, Zeno Fisher, to recuse himself, rather than abstaining, precluded their apparent adherents on the

Duree subsequently moved for reconsideration of the Site Plan at the September and October, 1994 Planning Commission meetings, however, his motion died for a lack of a second, notwithstanding the entitlement of Mr. Pecoraro or the other dissenting member in the August vote to have provided such a second.

Ms. Losada–Blanco and the Town of Sykesville appealed the August approval of this Site Plan to the B.Z.A. (the "Site Plan Appeal"). The B.Z.A. heard a full day of oral arguments on the Site Plan Appeal on October 26. At the conclusion of those hearings, the Board members declined, at the end of a long and fatiguing day, to engage in public deliberation or debate with each other over their votes but summarily indicated that they were denying the appeal. The Board issued its written decision on the Site Plan Appeal on November 22. That denial by the B.Z.A. of the Site Plan Appeal was one of the actions appealed to the circuit court and now to us.

In the interim, the County Commissioners had on October 18, 1994 conducted a public hearing on the proposed new ordinance, the effect of which, if and when it passed, would have been to invalidate the Site Plan for the Tower because of

---

Planning Commission from prevailing. The appellants invoke *Robert's Rules of Order.*

Under *Robert's*, and almost all other recognized authorities on Parliamentary Procedure, the Chairman of the Commission was not precluded from voting by the absence of a tie vote. When a Chairman is also a voting member, the Chairman, like any other member, is entitled to vote at any time. He may, however, only vote once. A Chairman frequently elects not to exhaust his vote prematurely so that he can remain in reserve to break any tie that might eventuate. He is not required, however, so to forebear. He is as entitled to vote as any other voting member.

In this case, the Chairman, Louis Pecoraro, could have voted "No" on the critical motion to approve the Site Plan. His vote would, according to his later testimony, have created a two-to-two tie. Under the circumstances, he could not, of course, have voted a second time to break the tie. From the appellants' point of view, a tie-breaking vote in their favor would have been redundant. Even a tie vote would have accomplished the appellants' purposes, for a tie vote would have meant that the motion to approve the Site Plan failed for lack of a majority. The whole argument goes nowhere.

its lack of a fall zone the radius of which would be equal to the height of the Tower. Without demeaning in the slightest the legitimate entitlement of each party to this appeal to "use the clock" to its maximum tactical advantage, at that point a race was on between the construction process and the legislative process. It was to the clear advantage of the appellees to "rev up" the construction process so as to get their shovels significantly into the ground before the likely enactment of the new ordinance could preclude them from doing so. By the same token, it was to the clear advantage of the appellants to "bog down" the construction process so that the likely new ordinance could intervene before any significant amount of dirt had been turned.

As we chart the progress of that race, attention focuses on the five-day period between Wednesday, October 26 and Monday, October 31, 1994. It was on Wednesday, October 26 that the B.Z.A. announced its oral decision to deny the appeal that had been brought to it by the protestants from the issuance by the Planning Commission of its approval of the Site Plan for the Tower. From the vantage point of the appellees, that was the moment when the road opened up for them to proceed to obtain a building permit and a zoning certificate and to commence construction.

On Thursday, October 27, the day following the B.Z.A.'s oral denial of the Site Plan Appeal, the appellee Sapperstein met with the County Commissioners and urged them, if they passed the new ordinance, not to apply its terms to the building of the Tower, the processing of plans and necessary documentation for which was already afoot. The appellees, however, were not content to let everything ride on whether the County Commissioners acceded to Sapperstein's request in that regard. Knowing that the County Commissioners planned to meet publicly at 4 P.M. on Friday, October 28, and that the proposed new ordinance was on the agenda for that meeting, West Shore sprang into immediate action. At 3:45 P.M., fifteen minutes before the meeting of the Commission was to convene, West Shore procured its building permit and its zoning certificate from the County Zoning Office. The

appellee Sapperstein attended the 4 P.M. meeting of the County Commissioners, presenting his newly-obtained zoning certificate to them and again urging that any changes caused by the proposed ordinance not apply to the building of the Tower.

For whatever reason, the County Commissioners did not take action on the proposed new ordinance on the afternoon of Friday, October 28. They deferred action at least until the following Monday morning. What that did, of course, was to give the appellees a golden window of opportunity to change the status quo over the course of the intervening weekend. Providing transportation via airplane from the Eastern Shore for a contractor and part of his crew so that work could begin, West Shore excavated the foundation for its tower over the weekend of October 29 and 30. By Monday morning, significant excavation and stockpiling of materials was already underway.

The County Commissioners were at the Hollenberry Road site on Monday morning. Apparently chagrined at the unanticipated extent of the change in the lay of the land and with several protesting, picketing neighborhood residents looking on, the Commissioners adopted the proposed law as Ordinance No. 122, making it immediately effective. The legislative forum where the vote was taken was right there on the ground. While prior versions of these amendments to the zoning ordinance had only applied its provisions to projects that had yet obtained a zoning permit, the version passed on Hollenberry Road purported to make the new provisions applicable to any tower site which had not yet obtained a use and occupancy permit.

Carroll County Code Official Ralph E. Green, who was poised on the scene as the County Commissioners took their vote on-site, immediately issued a "stop work order" to halt further construction of the Tower. Green subsequently wrote a letter to West Shore, dated November 3, stating that the stop work order had been imposed due to the requirements of

Ordinance No. 122 and that the previously issued building permit was, therefore, revoked.

West Shore, in its turn, appealed those actions to the B.Z.A. On December 29, 1994, the B.Z.A. held a hearing on West Shore's appeal. On February 8, 1995, the B.Z.A. issued its written decision upholding West Shore's challenge. The B.Z.A. found that West Shore had acquired vested rights in the zoning certificate by engaging in substantial construction of the Tower in good faith under a validly issued building permit prior to the actions of the County on October 31, 1994. The appellants filed a timely appeal of that decision (the "West Shore appeal") and moved to have the circuit court consider it in a consolidated proceeding with the Site Plan Appeal. The circuit court affirmed both decisions of the B.Z.A. in a Memorandum Opinion and Order dated July 6, 1995. This appeal to us has followed.

### The Issues

Despite the tangled administrative background, the issues that are literally before us for decision are mercifully more limited. The appellants have actually consolidated three legit-imate contentions into an omnibus contention. As they phrase it:

DID THE CIRCUIT COURT ERR IN HOLDING THAT WEST SHORE HAD ACQUIRED VESTED RIGHTS?

Thus phrased, the omnibus contention is not literally accurate. It was not, of course, for the circuit court to hold anything on the ultimate merits of the vesting. The question, rather, is whether the circuit court properly affirmed the decision of the Carroll County Board of Zoning Appeals when it ruled that West Shore had acquired vested rights. The circuit court was called upon simply to exercise a more modest appellate moni-toring of the administrative decision of the Board of Zoning Appeals. In that regard, we now look not *at* the decision of the circuit court but rather *through* the filter of the circuit court directly to the decision of the Board of Zoning Appeals

itself, in precisely the same way that the circuit court looked at it.

As we examine that decision of the B.Z.A., in the second or "West Shore appeal," as it ruled that West Shore's interest in going forward with construction had vested, there are three aspects to that decision that call for analysis. With a modest reordering of them, we can use the three subcontentions of the appellants just as they framed them:

1) Did the circuit court err in its reliance on the commencement of substantial construction as the primary and pivotal factor in deciding that West Shore had acquired vested rights?

2) Did the circuit court err in its legal conclusion that good faith reliance is not required as an element or a condition in establishing vested rights?

3) Did the circuit court err in its legal conclusion that the building permit was validly issued?

The appellants appealed to the circuit court in this case two separate decisions of the Board of Zoning Appeals: the resolutions by the B.Z.A. of 1) the earlier Site Plan Appeal and 2) the subsequent West Shore appeal. In the circuit court, Judge Luke K. Burns, Jr. affirmed both of those decisions of the B.Z.A. The appeal to us from that affirmance by Judge Burns could have placed before us the merits of both of those administrative actions by the B.Z.A.

In the last analysis, however, we now need only concern ourselves directly with the second of those decisions, the B.Z.A.'s resolution of the West Shore appeal. That was the decision that dealt with the only ultimately critical issue in the case, that of whether West Shore's right to go forward with construction had vested as of the morning of October 31, 1994. The propriety of the earlier decision by the B.Z.A., its resolution of the Site Plan Appeal, is of concern to us only indirectly and to the limited extent to which it may have had some impact on the vesting issue.

Thus, we are not directly concerned with whether Mr. Fisher had an ethical problem when the Planning Commission

voted to approve the Site Plan. We have no idea what his purported problem was and, therefore, have no idea whether his perceived problem was really a problem at all. It does not matter, however, because the whole issue is of no direct concern to us. Mercifully, we have no direct concern with the Byzantine subtleties between abstaining and recusing oneself in response to an ethical dilemma, an exotic problem which, to our knowledge, has not been remotely alluded to in the Maryland case law. We are not directly concerned with the voting procedures employed by the Planning Commission. We are not directly concerned with the substance of its decision not to require a fall zone equal to 100% of the height of the Tower. We are not directly concerned with how the B.Z.A. entertained and then disposed of the appeal from the Planning Commission. We are only concerned with any of these matters to the limited extent to which they affect the question of whether West Shore's right to continue construction had vested prior to the enactment of the new county ordinance enacted on October 31, 1994.

### The Vesting of Rights Generally

The first reasonably full general statement we find about vested rights in the context of zoning law is that of Judge Barnes in *Richmond Corp. v. Bd. of County Comm'rs,* 254 Md. 244, 255–56, 255 A.2d 398, 404 (1969):

> In Maryland it is established that in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use.

The *Richmond* case, however, was not one involving a vested right to proceed with construction. In that more particularized context, the description by Judge Liss in *Prince*

*George's County v. Equitable Trust Co.,* 44 Md.App. 272, 278, 408 A.2d 737, 741 (1979), is more to the point:

> That [vested rights] doctrine, which has a constitutional foundation, rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations.

*Ross v. Montgomery County,* 252 Md. 497, 250 A.2d 635 (1969) was a case in which the issue was whether construction had timely begun under a building permit that initially was validly issued but which arguably had lapsed prior to the commencement of the construction. In discussing vested rights in that context, Judge Finan, 252 Md. at 506, 250 A.2d at 640, quoted with approval from Rathkopf, *The Law of Zoning and Planning:*

> The Maryland cases appear to follow the prevailing principle of law governing such cases, a concise statement of which is to be found in Rathkopf, *The Law of Zoning and Planning,* (3d Ed.) Vol. 2, Ch. 57–6 § 3:
>
>> " * * * The majority rule, which can be synthesized from the multitudinous decisions in this area, may be stated as follows: A landowner will be held to have acquired a vested right to continue the construction of a building or structure and to initiate and continue a use despite a restriction contained in an ordinance where, prior to the effective date of the ordinance, in reliance upon a permit theretofore validly issued, he has, in good faith, made a substantial change of position in relation to the land, made substantial expenditures, or has incurred substantial obligations.* * *."

See also McQuillin, *Municipal Corporations,* (3d Ed.) Vol. 8, p. 272.

From these statements, we can distill the principle that before a "landowner will be held to have acquired a vested

right to continue the construction of a ... structure," two, or possibly three, requirements must be satisfied:

1) There must have been a validly issued permit authorizing the commencement of construction.

2) There must have been, as will be more fully discussed, some commencement of construction that is more than *pro forma.*

Whether the reference to proceeding "in good faith" establishes yet a third and independent requirement or is simply an adverbial modifier to commencing construction is problematic. Because the parties in this case have treated it as a distinct requirement, however, we shall also, for the sake of convenience, so treat it in this opinion. There is indeed some advantage to severing the adverb from the verb for analytic purposes. The commencement of construction is an objective phenomenon that can be observed on the ground, measured, and quantified. The "good faith" element is mental and subjective.

An overwhelming percentage of the case law that has considered this problem of vested rights has focused on the first requirement, the question of what is an adequate commencement of construction to trigger vesting. We shall begin our analysis with the consideration of that requirement.

### *Vesting Requirement No. 1:*

### *The Commencement of Significant Construction*

The seminal opinion on what constitutes an adequate commencement of construction to trigger vesting is that of Judge Rodowsky in *Prince George's County v. Sunrise Dev. Ltd. Partnership,* 330 Md. 297, 623 A.2d 1296 (1993). In that case, as in this, the developer obtained the approval of its site plan—on September 28, 1989. In that case, as in this, the developer obtained a building permit (for at least part of the job)—on December 20. In that case, as in this, the developer had certain work performed at the construction site on the day the building permit was issued. In that case, as in this, the county council was considering over a period of many months

a general rezoning, under which the construction project in issue would not have been permitted. In that case, as in this, the county council subsequently imposed a restriction (the downzoning of the property) that would, but for vesting, have aborted the project—on May 1, 1990. In that case, as in this, a county official issued an immediate stop work order—on May 4. In that case, as in this, the developer petitioned the board of appeals to set aside the stop work order. In that case, by way of contrast with this, the board of appeals declined to set aside the stop work order. In that case, as in this, the ultimate issue was whether the developer's right to continue construction had vested prior to the legislative change in the zoning requirements.

The only vesting requirement that was at issue in the *Sunrise* case was that of whether significant construction had commenced to trigger the vesting. Judge Rodowsky's synthesis of preexisting law bearing on this subject pointed out that the "Maryland law of vested rights is formed by the confluence of at least three streams of cases." 330 Md. at 310, 623 A.2d at 1302. He pointed out that although the three streams of cases might originally have been "analyzed as dealing with distinct problems," they had by "cross citation by this Court over the years [been] merged ... into one body of authority." *Id.* One of those lines of cases looked to the commencement of construction to determine "priority between mechanic's lien claimant and a mortgagee." *Id.* A single line of cases examined the commencement of construction in the context of a "statute that confers the right or privilege in issue [but] contains a time limit within which construction must begin." 330 Md. at 311, 623 A.2d at 1303. The "third stream of cases involves the issue of vested rights *per se.*" 330 Md. at 312, 623 A.2d at 1303. As Judge Rodowsky pointed out, the three lines or streams have now merged into a single body of law in terms of measuring the commencement of significant construction.

A leading definition of commencement of construction, relied on by *Sunrise*, 330 Md. at 307, 623 A.2d at 1301, was that articulated by Judge Horney for the Court of Appeals in *Rupp*

*v. Earl H. Cline & Sons,* 230 Md. 573, 578, 188 A.2d 146, 149 (1963):

These cases make it clear that before there can be the *commencement of a building* ... there must be (i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commencement of a building and (ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building. If either of these elements is missing then there has been no "commencement of the building." [Emphasis in original].

A second well recognized definition was that articulated by Judge Davidson in *O'Donnell v. Bassler,* 289 Md. 501, 508, 425 A.2d 1003, 1007 (1981):

Generally, in order to obtain a vested right in an existing zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting that use, the owner must initially obtain a valid permit. Additionally, in reliance upon the valid permit, the owner must make a substantial beginning in construction and in committing the land to the permitted use before the change in the zoning ordinance has occurred. [Citations omitted].

The *Sunrise* opinion, 330 Md. at 313, 623 A.2d at 1304, also relied on the characterization of the principle enunciated by Judge Barnes in *Rockville Fuel v. Gaithersburg,* 266 Md. 117, 127, 291 A.2d 672 (1972):

Such a "vested right" could only result when a lawful permit was obtained and the owner, in good faith, has proceeded with such construction under it as will advise the public that the owner has made a substantial beginning to construct the building and commit the use of the land to the permission granted.

From the analysis of all of the authorities, *Sunrise* distilled its own statement of the critical criterion as to when construction is significant enough to trigger vesting:

If the public could have seen that construction had started before the zoning change, the public can appreciate that the new law is not being violated. But, if construction, recognizable by the public as such, had not commenced before the change of law, later construction for a use that is no longer permitted is subject to the current zoning, and is in violation of it, so that the public will expect the new law to be enforced. Paraphrasing a portion of the opinion of the circuit court in this case, we hold that, in order for rights to be vested before a change in the law, the work done must be recognizable, on inspection of the property by a reasonable member of the public, as the commencement of construction of a building for a use permitted under the then current zoning.

330 Md. at 314, 623 A.2d at 1304.

In the *Sunrise* case itself, it was held that the minimal construction undertaken there was not enough to create a vested right that could stand against the subsequent legislative downzoning. In *Sunrise*, a building permit was issued on December 20, 1989. On that same day, a cement "footing" was poured. Two days later, some snow fencing was erected. At that point, all construction-related activity stopped. Nothing further had been done as of May 1, 1990, when the county council downzoned the property. The Court of Appeals, 330 Md. at 314, 623 A.2d at 1304–05, described the very minimal and inadequate nature of the construction:

Here, the pouring of a single 2' by 2' footing in the center of a nearly ten acre wooded site is the only construction to which Sunrise can point for its vested rights argument. The evidence is that building inspectors, who knew that the footing had been poured and who were on the property looking for the footing, could not see where it was. They were able to locate it only by use of the site plan. A member of the public is not required to be equipped with the column footing version of the site plan to observe if this construction had started. From the standpoint of a member of the general public who is either viewing the property from its boundaries or is consensually on the property, the

footing is not so clearly the commencement of construction as to render the Board's finding to the contrary arbitrary, capricious or without substantial evidence on the entire record.

■ By contrast with the situation in *Sunrise*, the construction that had been completed in this case by the morning of October 31, 1994 was no mere "token" construction but was extensive. It was, moreover, readily apparent and visible to any interested neighbors or other observers. Before rendering its ruling that West Shore's right to continue with construction had vested prior to the enactment of the new ordinance on the morning of October 31, the Board of Zoning Appeals made extensive findings of fact with respect to both the extent of the construction and its visibility:

By the time the ordinance was adopted, the site had been graded; an excavation for the tower base had been dug; and two layers of rebar steel had been installed. The first layer sat on bricks on the ground; the second layer was suspended from a wooden frame. The Board finds that the status of the project is fairly described in the field notes made by the County Building Inspector, Jim G. Brown, contained in Protestants' Exhibit 2, which read as follows:

"3/Status of job: A 26' × 26' excavation approx. 4' deep with two mats of # 7 rebar on 12" centers wire tied has been installed. A system of wood girders made out of triple 2 × 12's span across the excavation to suspend the top rebar mat. The lower rebar mat is setting on top of support brick. At this time no concrete has been placed. See attached photo's. 10–31–94 Jim G. Brown."

The work is depicted in exhibits introduced through West Shore (Exhibits 13–27). Anchor bolts had been brought to the site but not yet placed.

The work, particularly the wooden frame superimposed over the steel, was visible from the closest road, Hollenberry Road, approximately 95' from the tower site. All the exhibits depict the wooden timbers rising up above the

ground, causing the construction site to be clearly visible for a considerable distance. In the context in which the work was being performed, the work clearly indicated that a tower was being erected. The testimony was that the tower proposal was well known in the community. It was hotly resisted by some residents and by the Town of Sykesville. As a matter of fact, at the very time the erection was occurring on Monday morning, there was a group of protesters on Hollenberry Road protesting the erection of the tower. It seems to the Board that there could be no better proof that the erection of the tower was known in the neighborhood than that the erection was being protested by certain members of the public. In short, the fact that work was underway for the erection of the tower was known to the surrounding community because the construction was clearly visible.

The appellants offered no contradictory evidence on the subject of the physical construction or its visibility and no significant countervailing argument. The extensive construction here bore no resemblance to the mere "token" involved in *Sunrise,* and this case, therefore, is obviously not controlled by the result reached there. Judge Burns, in his Memorandum Opinion, recited in detail the specific fact findings of the B.Z.A. In that regard, he concluded that "all of these facts were found by the B.Z.A. and the Court further finds that they are supported by the record and are fairly debatable." We hold that he was correct in so finding.

### Vesting Requirement No. 2:

### The Construction Shall Have Commenced in "Good Faith"

■ For vesting purposes, it is not enough that substantial and visible construction shall have physically commenced. It is also required that there shall have been "good faith" commencement. In examining the quality of "good faith" as an autonomous phenomenon of its own, we are essentially writing on a clean slate. For analytic purposes, we need to

isolate the mental element that attends the physical commencement of construction. We then have to see how the presence or absence of that required mental element has been pivotal in various cases in several of the doctrinal tributaries that have come together to form present-day "vested rights" law. To be more precise, of course, what we are being called upon to examine, as a psychic phenomenon, is actually "bad faith." That is the thing that the party charging it must prove; *good* faith, on the other hand, need be nothing more than the absence of proof of bad faith.

What then, in this context, is meant by bad faith? Like successive apparitions before Ebenezer Scrooge, three possibilities loom. Bad faith may manifest itself as the false start, sometimes having the effect of leading the observer into believing that the construction game is actually afoot when it is not. The essence of the bad faith, however, is the deliberate false start itself and not the effect that it may have on the observer. That is the most likely manifestation and the one that seems to be implicit in the skimpy case law we have on the subject. Bad faith, on the other hand, might theoretically manifest itself as the hyperactive opportunism of an entrepreneur driven, like Casca, to "seize the current as it serves." That is the *"carpe diem"* vision of bad faith strongly urged on us by the appellants. Bad faith might finally take on a more Freudian or guilt-ridden shape, whereby West Shore should, according to the appellants at least, be haunted periodically in the sleepless mid-watches of the night by the restless ghost of Zeno Fisher's ethical dilemma as the roll is called at the Planning Commission. That is the sub-theme of bad faith being urged on us by the appellants. It behooves us to confront these apparitions one by one.

### A. A Deliberately False Start Is Bad Faith

The notion of a "good faith commencement of construction" self-evidently has two elements: 1) the physical fact of the construction that has actually begun and 2) the mental element involving the purpose or motive of such construction. In *Prince George's County v. Sunrise, supra,* Judge Rodow-

sky explained how our present law on this aspect of vesting has been "formed by the confluence of at least three streams of cases." 330 Md. at 310, 623 A.2d at 1302. "The earliest of the line of cases involved priority between a mechanic's lien claimant and a mortgagee." *Id.* In tracing that stream of cases back to the wellspring, we soon discover the venerable lineage of the bifurcated nature of the "good faith commencement of construction."

*Kelly v. Rosenstock*, 45 Md. 389 (1876), seems to have been the first case where the two elements came together in a combined analysis. In *Kelly*, the Court of Appeals traced its first articulation of the physical element to *Brooks v. Lester*, 36 Md. 65, 70 (1872), in which the Court explained that "the commencement of the building" means "some of the work and labor on the ground, the effects of which are apparent, easily seen by everybody, such as beginning to dig the foundation, or work of like description, which everyone can readily see and recognize as the commencement of a building."

The Court of Appeals in *Kelly* then looked to its earlier decision of *Jean v. Wilson*, 38 Md. 288 (1873) as its first articulation of the mental element. In *Jean v. Wilson*, adequate physical work had been done to satisfy that aspect of the commencement of construction requirement. Notwithstanding that fact, the Court of Appeals found that the physical work did not constitute the *commencement of the building* because of the absence of the mental element. The Court reasoned, 38 Md. at 296–97:

> In the Pennsylvania cases, above cited, it appears that the work, which was to be the *commencement of the buildings*, had been done with the intention and purpose, then formed, to continue the work to the completion of the buildings. Where work is done with the design to go on and construct a building, there can be no question that it must be regarded as the *commencement of the building* ... In the case before us the proof shows that the work done was not done with any design or purpose of constructing a building at that time, but was done solely with the intention and for the purpose of grading the lot and removing the water there-

from, so that it might be in a condition to lease or to build upon at some future time. That this was the intention and purpose of the owners is conclusively shown by the fact, that when this object was accomplished, work was immediately stopped and the workmen paid off and discharged. How can it be held, with either reason or justice, that a building has been commenced in the face of the uncontradicted proof in the case, that the owners had no intention to erect any building, but merely to grade and remove the water from the lot, and when it is apparent that, when these objects were attained, nothing more was ever done upon the premises until the spring of 1870. [Emphasis in original].

In *Rupp v. Earl H. Cline & Sons,* 230 Md. 573, 188 A.2d 146 (1963), the issue before the Court of Appeals was the same as the issue now before us: "The principal question is what constitutes the commencement of a building ..." 230 Md. at 577, 188 A.2d at 148. The *Rupp* Court traced the development of the controlling law from *Brooks v. Lester* and *Jean v. Wilson* through *Kelly v. Rosenstock.* It then gave its own distillation of that law:

These cases make it clear that before there can be the *commencement of a building* ... there must be

(i) a manifest commencement of some work or labor on the ground which every one can readily see and recognize as the commence of a building and

(ii) the work done must have been begun with the intention and purpose then formed to continue the work until the completion of the building.

If either of these elements is missing then there has been no "commencement of the building ..." [Emphasis in original].

230 Md. at 578, 188 A.2d at 149. *See also Frank J. Klein & Sons v. Laudeman,* 270 Md. 152, 157, 311 A.2d 780 (1973); *Prince George's County v. Sunrise Dev. Ltd. Partnership,* 330 Md. 297, 623 A.2d 1296 (1993).

Another of the originally distinct streams of cases entering into what *Sunrise* referred to as the ultimate "confluence" consists of those cases "in which the statute that confers the

right, or privilege in issue contains a time limit within which construction must begin." *Prince George's County v. Sunrise,* 330 Md. at 311, 623 A.2d 1296. That stream of cases also focused on the good faith commencement of construction and, in the words of *Sunrise,* 330 Md. at 310, 623 A.2d 1296, "cross citation by this Court over the years has merged them into one body of authority."

. From that stream of case law emerges the contrast between *Ross v. Montgomery County,* 252 Md. 497, 250 A.2d 635 (1969) and *Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975), which illustrates vividly the kind of *false start* that distinguishes a mere commencement of construction from a good faith commencement of construction. The application of the physical part of the two-pronged analysis of "good faith commencement" yielded the same result in *Ross* and *Pemberton.* In *Ross,* however, the commencement was not a "good faith" commencement, whereas in *Pemberton* it was.

*Ross* provides a classic example of the type of "false start" that negates good faith in the commencement of construction. The critical date, on which a six-month building permit was due to expire, was April 28, 1967. Anticipating that deadline, the developers on April 11 called a county building inspector to the job site and, with him present, "they poured one footing for the building. Appellants contend that this foundation work was done in order to make it clear that construction had begun in order to retain their building permit which would have been six months old on April 28, 1967." 252 Md. at 500, 250 A.2d 635. On April 12, however, "the day following ... the pouring of the initial footing, appellants suspended construction of the foundation and filled in the excavation. Nothing more has ever been done under the building permit." *Id.*

After an evidentiary hearing, the trial judge concluded that the ostensible commencement of work had not been in good faith. Judge Finan, for the Court of Appeals, characterized the trial judge's finding:

The lower court was of the opinion that the appellants were not financially in a position to begin construction under the building permit within six months after its issuance and that *they did not in good faith commence work* under the permit. *The work* done on April 11, 1967, *was* held to be *merely "window dressing"* for the benefit of the County's building inspector . . .

252 Md. at 501, 250 A.2d at 637 (Emphasis supplied). In affirming that decision by the trial judge, the Court of Appeals explicitly used the phrase "good faith":

We think the chancellor's finding that *the appellants did not, in good faith, begin actual construction* under the building permit within a period of six months after its issuance was correct and should not be disturbed.

252 Md. at 502, 250 A.2d at 638 (Emphasis supplied).

In *Pemberton,* it was even later in the process that construction commenced. The developer, Exxon, had until August 20, 1969 to commence work. It did not commence work until August 19, one day before the deadline. The protestants in that case charged that such an eleventh-hour effort "was not a *bona fide* attempt to begin construction." 275 Md. at 367, 340 A.2d at 243. Judge Digges' opinion for the Court of Appeals pointed out that the physical or objective aspect of the two-pronged commencement test yielded the same affirmative result in *Pemberton* that it had in *Ross.* The critical difference in the two results turned, rather, on the second prong of the test, inquiring into whether the construction had been undertaken in good faith:

The instant case is comparable to the *Ross* case, but only to the limited extent that the same type of work was performed, *i.e.,* excavation and construction of footings; *after that similarity the two cases part company, especially in regard to the all important continuation-of-effort element set out in Rupp.*

275 Md. at 371, 340 A.2d at 245 (Emphasis supplied).

In *Pemberton,* the County Board of Appeals had found, as a matter of fact, that Exxon had commenced its construction in

good faith. The essence of good faith in such a context was that the construction not have been a false start or what *Ross* characterized as "window dressing," but that it have been a *bona fide* intention of continuing with the construction thus begun and carrying through until the project was completed. The "intention to go forward" is the critical element. In reciting the evidence that supported the finding of the Board of Appeals, Judge Digges' opinion stressed the existence of that purpose as the pivotal element of good faith:

> Indeed, it cannot earnestly be argued that Exxon was without funds to proceed with work on the station, and the evidence, furthermore, clearly shows that Exxon consistently worked on the project and finished it on 9 June 1971, at a total cost in excess of $230,000. The Board specifically found that: "the subsequent satisfactory completion of the project indicated that it [ (Exxon) ] *did indeed intend to go forward with construction* which it began on August 19, 1969."

275 Md. at 371–72, 340 A.2d at 245 (Emphasis supplied).

In affirming the decision of the Board, the Court of Appeals held that it was "based on evidence that is at least 'fairly debatable.'" The Court of Appeals specifically made reference to the subsequent completion of the project as strong evidence of an intent to complete the project. It referred to "evidence of a clear manifestation of the consistent intent by Exxon to continue (which intent is concretized in that the construction was followed through to completion)." 275 Md. at 372, 340 A.2d at 245.

■ Indeed, as Judge Liss in *Prince George's County v. Equitable Trust Co., supra,* sets out the three necessary conditions for invoking successfully the vested rights doctrine, it is clear that the qualifying adverbial phrase "in good faith" modifies the verbal phrase "commences to build" and nothing else. We shall quote from that statement of the doctrine *verbatim,* but lay it out schematically in the interest of better clarity:

That doctrine ... rests upon the legal theory that when a property owner

[1]   obtains a lawful building permit,

[2]   *commences to build in good faith,* and

[3]   completes substantial construction on the property,

his right to complete and use that structure cannot be affected by any subsequent change of the applicable building or zoning regulations.

44 Md.App. at 278, 408 A.2d at 741 (Emphasis supplied).

What the appellants have done in argument and in brief, at times with perplexing (if not, indeed, subconscious) subtlety, is gently to nudge the modifier "good faith" or "in good faith" away from the second requirement, dealing with the commencement of construction, and to attach it to the first requirement, dealing with the obtaining of a valid permit.  If that little linguistic misdirection is overlooked at the threshold, it is all too easy to go charging off down irrelevant tangents. As the appellants' efforts here ominously illustrate, if once the phrase "good faith" is cut loose from its moorings in the case law that gave it birth and allowed to float free, the phrase can glibly be used to refer to anything that might not pass muster in Sunday School class.  In the best of all worlds, of course, everything should be done in good faith—from getting up in the morning to going to bed at night—but that is not the concern of the vested rights doctrine.  As a legal term of art concerned with the vesting of rights, "good faith" has a more austerely limited meaning.  One of our primary missions in this opinion is to pin down the modifier.

We hold that in this context the adjectival phrases "good faith" and "in good faith" modify the noun phrase "commencement of construction" and nothing else.  They are not concerned with the morals, the ethics, or even the legality of the entire development process but focus only with whether the act of commencing construction is undertaken with the intention of continuing and finishing the job.

In coming up somehow with the notion of "good faith reliance" rather than the more apposite "good faith commencement of construction," it appears that the appellants, advertently or inadvertently, have borrowed phraseology from the related but clearly distinct law of zoning estoppel. *See Offen v. County Council,* 96 Md.App. 526, 625 A.2d 424 (1993), *rev'd on other grounds, County Council v. Offen,* 334 Md. 499, 639 A.2d 1070 (1994); *Relay v. Sycamore,* 105 Md.App. 701, 661 A.2d 182 (1995), *cert. granted, sub nom., Sycamore Realty v. People's Counsel,* 341 Md. 30, 668 A.2d 422 (1995). The differences between vested-rights law and zoning-estoppel law are significant. With respect to those differences, *Relay v. Sycamore,* 105 Md.App. at 724–25, 661 A.2d 182, quoted with approval David G. Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes,* 1971 Urban L. Ann. 63, 64–66:

> The defense of estoppel is derived from equity, but the defense of vested rights reflects principles of common and constitutional law. Similarly, their elements are different. Estoppel focuses upon whether it would be inequitable to allow the government to repudiate its prior conduct; vested rights upon whether the owner acquired real property rights which cannot be taken away by governmental regulation.

The use of the borrowed phrase is inappropriate for two reasons. In the first place, the conduct that it is used to measure with respect to zoning estoppel is not an element in the very different world of vested rights. In the second place, the phrase comes from general zoning estoppel law and not from the more "narrow version of zoning estoppel" recognized in Maryland. In *Relay v. Sycamore,* 105 Md.App. at 727, 661 A.2d 182, Judge Davis commented on the difference between the general law and the Maryland version thereof when it comes to the subject of "good faith reliance":

> Under the black-letter definition of zoning estoppel, the focus is on the landowner's *good faith reliance.* Under our limited version of zoning estoppel, the focus is the government's arbitrary and unreasonable conduct, as well as the

causal relationship between the government's conduct and the landowner's inability to proceed to actual construction. [Emphasis supplied].

█ It was in the more limited and proper sense, as a precise term of art, that the Board of Zoning Appeals applied the phrase "good faith" in this case. After having made detailed and specific findings as to the physical nature of the work done prior to the morning of October 31, 1994, the Board made equally detailed and specific findings with respect to the element of good faith, properly employed:

The testimony was that if the work had not been interrupted, it would have continued until completion, and the Board accepts this testimony. All the facts and circumstances point to *a bona fide commencement of construction,* and the Board so finds. The plans filed with and approved by the County were full plans for the construction of the tower, not just the foundation. See Protestants' Exhibit 2. At least 30 days prior to the commencement of the work West Shore had ordered the tower to be manufactured; according to the testimony of the West Shore representative, it had been partially manufactured at the time the work commenced, but no part of the tower was on the site. Arrangements had been made for an inspection of the work on Monday morning but that was cancelled because the work was not far enough along. The Board can envision circumstances where an owner will perform some work in an attempt to "get something in the ground" with no real intent to proceed to completion; the only intent is to achieve protection against a change in the applicable law. *The Board finds that here West Shore made a bona fide commencement of construction with every intent to proceed to completion.* [Emphasis supplied].

█ As we ring down the curtain on our encounter with this proper conceptualization of "bad faith" and prepare to meet, more briefly, with the more illusory apparitions, a word is in order about the controlling standard of appellate review. Again, we find guidance in *Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975). One of the three issues for

decision by the Court of Appeals in that case was the charge that Exxon's physical labors did not amount to "a *bona fide* attempt to begin construction." 275 Md. at 367, 340 A.2d at 243. Judge Digges stated unequivocally that whether the issue of "good faith" or "*bona fide* effort" were to be considered as a question of pure fact or as a mixed question of law and fact, the courts should extend maximum deference to the conclusion of the administrative agency:

> Since these three questions, which are either clearly factual or at least mixed questions of law and fact, have been answered at the administrative level prior to this matter reaching the courts, *our function,* as was also true of the circuit court, *is not to substitute our assessment of the facts for those of the Board as they relate to these issues, but merely to evaluate whether the evidence before the Board was "fairly debatable"* such that a reasoning mind could reasonably have reached the same result as did the administrative agency upon a fair consideration of the factual picture painted by the entire record before that body.

275 Md. at 367–68, 340 A.2d at 243 (Emphasis supplied). The issue of the good faith commencement of construction was fairly debatable. There was ample evidence before the Board of Zoning Appeals to support its findings. Under those circumstances, it is incumbent on us, as it was incumbent on the circuit court, to defer to those findings and the ruling based upon them.

Although we have now disposed of the appellants' charge of bad faith in the only sense in which it is legally apposite, it is nonetheless fitting that we attempt, albeit more briefly, to lay to rest with some finality the other two spirits that the appellants have invoked, lest they appear periodically to haunt others who have not had time to go through the laborious homework in the case law and even as they initially haunted us.

## B.  Calculated Opportunism Is Not Bad Faith

As an almost visceral reaction, the appellants seem to find distasteful and unbecoming the speed and the energy dis-

played by West Shore over the critical weekend of October 25 to October 31. More laid-back "folks," they seem to suggest, would not so aggressively seize the day or leap with such alacrity through a narrow window of opportunity. They criticize West Shore for obtaining a building permit at 3:45 P.M. on Friday, just fifteen minutes before the County Commissioners were due to meet. They criticize West Shore for flying in equipment and a crew to work on a Saturday and a Sunday. They criticize West Shore for proceeding with the commencement of construction "with full knowledge of pending legislation which would prohibit such construction." They do not allege that such behavior was unlawful. They simply label it as "bad faith."

The case law, however, has been far kinder toward those attributes that some might see as the Yankee work ethic, the fulfillment of the adage "The early bird catches the worm," or the qualities that Horatio Alger, Jr. might have tagged "get-up-and-go" or "gumption." The cases, indeed, establish that there is no absence of good faith in the commencement of construction shown by 1) the fact that construction commenced when it did for the deliberate purpose of preventing a building permit from expiring, 2) the fact that construction was precipitously begun at the very last minute before its entitlement lapsed, or 3) the fact that construction is begun with full knowledge that legislation was then pending which was highly likely to preclude such construction once enacted.

*Frank J. Klein & Sons v. Laudeman,* 270 Md. 152, 311 A.2d 780 (1973) was a case involving a race by a contractor to get construction begun before a building permit and zoning certificate could expire. The critical date was February 9, 1969. At the request of the owner, the contractor agreed to and did "commence work on the project despite the fact that there existed no formal construction contract between" him and the owner. Time was obviously of the essence. 270 Md. at 155, 311 A.2d at 782. In that mechanics' lien case, a trial judge ruled that the construction had not commenced in good faith.

The trial judge found as a matter of fact that "the admitted primary and only purpose for commencement of construction on or about February 9, 1969, was to prevent the invalidation of the building permit and zoning certificate which were about to expire."

Notwithstanding that finding, the Court of Appeals reversed the circuit court and held that the entertaining of such a purpose for the commencement of construction did not establish that the construction had been commenced in bad faith. The key criterion of good faith continues to be, quite aside from other motivations, whether the developer intends to finish what it has begun. Judge Digges held for the Court of Appeals:

> [E]ven if it is assumed that preservation of the zoning permit was the primary purpose for beginning construction in February of 1969, this intention is not incompatible with the second test set out in *Rupp.* In fact, it is entirely consistent. *The abrupt commencement of work, in an effort to save the life of the required zoning and building permits, certainly indicates a desire to see the nursing home completed.* It would be unreasonable to suppose that one would go to such great lengths to preserve the right to pursue a project and at the same time entertain no intention of completing it. The testimony of Spottswood Bird, one of the principal stockholders in Lakeview Acres and a personal guarantor of the Baltimore Federal note, that "my zoning was going to expire and that the only way I could protect it would be to start some type of work on that property that would indicate *intention to go ahead* with a nursing home project" lends substantial support to our interpretation of these facts [emphasis added in original]. Clearly, work which was admittedly performed to demonstrate an intention to pursue a project to completion for zoning purposes is also, we think, sufficient to show that very same intention which is also a requirement of the mechanics' lien law.

270 Md. at 158–59, 311 A.2d at 784 (First emphasis supplied).

*Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975) involved an eleventh-hour rush by the developer to

beat the clock. The Court of Appeals described, 275 Md. at 367, 340 A.2d at 242, the last-minute nature of the commencement of construction:

However, it was not until 19 August 1969, one day before the end of the twelve-month period stretching from the original granting of the special exception, that, all on the same day, Exxon: obtained a building permit for the construction of a retaining wall; dug a trench with a backhoe on the southeast side of the property; and then, after installing horizontal steel rods for support, poured five to six yards of concrete into the excavation for footings.

The protestants complained that a frantic effort in the waning hours of the year "was not a *bona fide* attempt to begin construction." The County Board of Appeals, the circuit court, and the Court of Appeals all held that a good faith commencement of construction can occur just as readily on the last day as on the first day:

[T]he appellant argues that, even if the permit was obtained and commencement attained, this alleged start was not a bona fide beginning of the service station since it was done at the last minute, in the pouring rain and "all work done on that [19 August] day was not only not used, but was completely obliterated!"

It is of little moment, we conclude, that the work was done on the day before the special exception lapsed; as, *when the law establishes a period within which something is to be achieved, it is deemed to be just as accomplished whether it be performed on the first day or the last.*

275 Md. at 372, 340 A.2d at 245 (Emphasis supplied). There is no penalty if you beat the clock. The only penalty is in not beating the clock.

*Prince George's County v. Equitable Trust Co.,* 44 Md.App. 272, 408 A.2d 737 (1979) concerned the same situation that has so chagrined the appellants in this case, commencing construction so as to vest a right even while probably adverse legislation is in the final stages of passage.

Equitable Trust managed, just barely, to get construction started on a commercial development several days before the Prince George's County Council was able to finalize its adoption of a Sectional Map Amendment that would have downzoned Equitable Trust's property from commercial to residential.

The adoption of the Sectional Map Amendment was on May 2, 1978. The amending process, however, had been under consideration and then in the mill for approximately twenty months. Public hearings were held on February 28, March 1, and April 12, 1978. Equitable Trust was fully aware of those hearings and had been involved in some of the deliberations. At the earlier hearings, the legislation seemed to be evolving in a way that would have been favorable to Equitable Trust's commercial development. At the April 12 hearing, however, the legislative process took an adverse turn. It was clearly in the strategic interest of Equitable Trust to move forward, if it could, to vest its existing rights by commencing construction before the county council took final action. On April 26, six days before the enactment of the amendment, Equitable Trust obtained a building permit. Footings were poured on that very day and on the succeeding day. By May 2, "not only had footings and foundations been constructed, but walls were at least partially erected." 44 Md.App. at 275, 408 A.2d at 740.

In that case, as in this, a county governmental official revoked Equitable Trust's building permit immediately upon the passage of the new legislation on May 2. There, as here, the developer appealed to the County Board of Appeals. The board of appeals in that case, as here, found that the right to proceed with construction had vested and the revocation of the permit was improper. The circuit court affirmed the decision of the board of appeals and this Court, speaking through Judge Liss, affirmed that decision:

Equitable having obtained a lawful building permit and completed substantial construction has vested rights which cannot be taken away by amendment of the zoning regulations.

44 Md.App. at 279, 408 A.2d at 742. It is not bad faith to beat the legislative train to the crossing. It is, indeed, when possible the smart thing to do.

The B.Z.A.'s conclusion in this regard, with which we agree, was:

West Shore had obtained a valid permit for construction and commenced construction to the point that the neighborhood was aware that the erection of a tower was under way. *The Board has no doubt but that West Shore followed the admonition, "Seize the Day!" In the Board's view, however, that does not disqualify it from obtaining vested rights.* No one has suggested that West Shore was anything but up front about its desire to obtain a permit and erect the tower. *There is nothing wrong with acting expeditiously to commence construction knowing that it is always within the County's power to take away the previously granted approval.* The County has suggested that West Shore did not have the requisite good faith because it knew of the pending ordinance but the Board rejects this view. [Emphasis supplied].

## C. A Sense of Universal Angst Is Not Bad Faith

Javert-like, the appellants just won't let go of the conscience of Zeno Fisher as he perceived a possible conflict of interest at the Planning Commission on August 16, 1994 and then may not have known quite the optimum thing to do about it. Relentlessly, they not only attribute moral fault to Zeno Fisher but then transfer that moral fault to West Shore, perhaps in perpetuity. Because the Board of Zoning Appeals ruled that it had no jurisdiction to entertain the question of some county official's possible ethical problem, there would now appear to be no modality through which Zeno Fisher, or West Shore as his moral surrogate, can ever expiate that purported original sin. Fortunately, the arguably never-ending burden will not be that heavy.

There is no case law concerning an issue such as this. This is for the self-evident reason that the theory of guilt is so

strained and attenuated that it has never before been urged in the courts of this state or its predecessor proprietary colony. Under the circumstances, we do not hesitate to speak *ex cathedra* and to pronounce that Mr. Fisher's voting problem, whatever it may have been, will not consign West Shore's commencement of construction on the weekend of October 28 to October 31 to whatever level Dante may have reserved for enterprises pursued in bad faith.

### Vesting Requirement No. 3:

### A Validly Issued Permit

The third and final requirement for the vesting of the right to proceed with construction is that the construction shall have commenced *pursuant to a validly issued permit.* In examining this requirement, we are no longer looking at West Shore or its state of mind, as it *applied* for the building permit. Coincidentally, West Shore's applications for the building permit and the zoning certificate had, as a matter of course, been filed back in October of 1993, when it first applied for a conditional use to construct the Tower. In examining the satisfaction of this third vesting requirement, our focus is on the facial validity of the permit itself (or, at most, on the motivation of the governmental official issuing the permit). It is the validity of the issuing process, not the validity of the application process, that is under scrutiny.

The appellants challenge the validity of the permit on two grounds. The first of these, consuming five pages of the appellants' brief, is simply a rehashing of the voting procedure and of Mr. Fisher's possible ethical problem at the Planning Commission meeting in August. Nothing more need be said by us with respect to this issue. An arguable procedural misstep or voting irregularity will not taint everything that follows that vote. One might as readily argue that the building permit was invalid because a member of the Planning Commission had lied about his qualifications on his application to be appointed to the Commission or as readily point to some alleged irregularity in the election of the County Commission-

ers who made the appointments to the Planning Commission. The issuance of a building permit does not contemplate that the building inspector undertake, *sua sponte*, so remorseless and open-ended a probe into the operations of County government and into the ethical behavior of its officials. Would it be enough, for instance, for the building inspector simply to monitor Mr. Fisher's handling of his conflict of interest, or would it be incumbent on the building inspector to turn up that conflict of interest in the first instance? The appellants' argument, on a moment's reflection, is its own refutation.

The second ground the appellants now assert for challenging the validity of the building permit is that it was issued prematurely. They argue that a building permit may not be issued until a site plan approval is final. They argue that the Site Plan approval voted on by the Planning Commission on August 16 was frozen in non-final form by the appellants' appeal of that action to the B.Z.A. They argue further that that Site Plan approval was not thawed by the oral decision of the B.Z.A. denying the appeal on October 26 but remained frozen pending the follow-up written decision of November 22. The Site Plan approval, the argument runs, was not yet final when the building permit issued on October 28 and the building permit was thereby invalid.

The direct issue before us, of course, is only the propriety of the ruling of the B.Z.A. that West Shore's right to proceed with construction had vested and that that right, therefore, was not adversely affected by the passage of the new ordinance on October 31, 1994. We reject the argument that West Shore's right had not vested. We reject the argument for two independent reasons: 1) the question of the initial validity of the building permit, based on the alleged prematurity of its issuance, was never properly raised before the B.Z.A.; and 2) even if the question had timely been raised challenging the fact that West Shore had gone forward and obtained and then acted on a building permit during the interim between the B.Z.A.'s oral decision of October 26 and its written opinion of November 22, such a procedural "jumping of the gun" did nothing more than subject West Shore to

the attendant risk that the B.Z.A. might have changed its position in some significant regard during the interim but did not, *ipso facto,* invalidate the building permit. For three weeks West Shore acted at its peril but emerged, on November 22, unscathed.

### A. The Initial Validity of the Building Permit Was Never Raised as an Issue

The building permit now denigrated by the appellants was issued on October 28, 1994. The appellants, however, never directly challenged the validity of that permit. The County, to be sure, might have attempted to challenge its validity indirectly by asserting such premature issuance as the basis for its "revocation" of the permit three days after issuance. Pointedly, it never did so. It operated on the contrary assumption that the building permit *had been validly issued* and it premised its attempted revocation on a totally different ground.

The County's actions, moreover, spoke as loudly as did its words. Carroll County would have had no need to *revoke* a building permit if it had been, as the appellants allege, invalid ad initio. If, on the other hand, the County considered the building permit to have been valid at the moment of issuance and only rendered invalid, nunc pro tunc, by the passage of the allegedly supervening ordinance, then revocation would have been the redress called for. That was the road the County took. It may not now look wistfully down the road not chosen.

The November 3 letter to West Shore from the Chief of the Bureau of Permits and Inspections made the County's position clear:

*I am revoking the issuance of the Building permit* due to the fact that it is in violation of the setback requirements. (Emphasis supplied).

That letter also fully set out the County's position as to why the stop-work order had been issued three days earlier:

A building permit was issued to you on Friday, October 28, 1994 to construct the above referenced tower. On October 31, 1994 a STOP WORK ORDER was issued on the project. *This was due to new requirements* for communication towers adopted by the County Commissioners under Ordinance # 122, adopted October 31, 1994. Enclosed is a copy for your review. *These new requirements are contrary to the construction and location of your tower.* [Emphasis supplied].

The West Shore appeal to the Board of Zoning Appeals, the ultimately critical administrative action now under review, was formally designated as "An appeal from a stop work order and *revocation of building permit* 93–3526 for construction of a communications tower." (Emphasis supplied). West Shore never raised before the B.Z.A. any issue as to the initial validity of the building permit. The only issue was that of revocation on the basis of the October 31 Ordinance.

The B.Z.A. made specific findings of fact that Ralph Green, the Chief of the Bureau of Permits and Inspections, confirmed, in a letter to West Shore, the fact that the issuance of the stop-work order and the *revocation of the previously issued building permit* were actions taken because of the adoption of the new ordinance on October 31. The B.Z.A. also specifically found that Solveig L. Smith, the County Zoning Administrator, issued a memorandum confirming that the verbal decision made on October 31 had been "to *revoke* the previously issued zoning certificate" (emphasis supplied) on the basis of the allegedly supervening requirements of the new ordinance. The B.Z.A. further found that neither Mr. Green nor Ms. Smith had "alluded in any way to the then pending appeals of the Planning Commission's decision as a reason to revoke the building permit." The Board found as a matter of fact, with solid support in the evidence, that "the *revocation* was because of the passage of Ordinance 122 and not because of the appeal of the Planning Commission decision." (Emphasis supplied). Self-evidently, a building permit that is considered to be invalid ab initio does not need to be *revoked.* At all pertinent times, the Carroll County authorities treated the

building permit as something that had been validly issued and was, therefore, in need of revocation.

Indeed, the actions of the County Commissioners in amending the new ordinance immediately prior to its final enactment were very revealing in that regard. All earlier versions of the ordinance provided that it would be "applicable to any tower site which had not [at the time of the adoption of the new ordinance] *obtained a building permit.*" (Emphasis supplied). That was the version still pending on Friday afternoon, October 28. On Monday morning, October 31, however, the County Commissioners recognized that West Shore's right to continue construction would have vested and that it would *not* have been covered by the proposed ordinance in its original form. The ordinance was, therefore, amended at the eleventh hour so as to be "applicable to any tower site which had not obtained a use and occupancy permit" in a patent effort to re-embrace West Shore within its coverage.

The appeal by West Shore was taken expressly from the actions of County officials—the issuance of the stop-work order and the revocation of the building permit—for the express reasons given by those officials. As one of its alternative reasons for ruling as it did, the B.Z.A. made it clear that the precise question before it for review was *not* the validity of the building permit but rather the propriety of its subsequent revocation by the County for the reasons given by the County:

> The Board finds it highly relevant that *when the County revoked the building permit* and when it revoked the zoning certificate, by separate actions, *the experienced officials responsible* for those actions *relied on the fact that the use was no longer permitted by Ordinance 122, and not on the fact that the site plan had been appealed.* Administrative practice has a role in the interpretation of a law. Here the clear message from the administrative practice is that the authority to accomplish the work was not stayed by the site plan appeal. The word "proceedings" is an undefined term and must draw its meaning from the administrative practices and procedures of the County. An observer of the events here under review would conclude from the written

revocation decisions that the appeal of the site plan did not stay the authority to commence construction. The Board must be guided by these decisions rather than by the County's belated position that the appeal had the effect of a stay.

In short, the reason why Section 4.07 does not apply is because *there was no appeal of the building permit/zoning certificate.* A supporting basis for this conclusion is the fact that neither administrative official took this position when the stop work order was issued and the permit was revoked. (Emphasis supplied).

In affirming the decision of the B.Z.A., Judge Burns, in his Memorandum Opinion, pointed out that Carroll County had never challenged the building permit as having been invalid at the time of its issuance. The County urged the *ex post facto* invalidation of the permit only because of the passage of the allegedly supervening ordinance. The County, indeed, treated the building permit as having been fully valid at the moment of its issuance. Judge Burns summarized the evidence and the arguments before the Board:

*The County itself presented to the Board as evidence a full, unconditional building permit, which was issued after careful and full review by its building permits department. At no time has that department, or any other agency of Carroll County, stated or indicated that the permit was invalidated for any reason other than the adoption of Ordinance 122.* If such a declaration had been made, West Shore would have had an opportunity to appeal or contest that administrative action under applicable rules and guidelines. It seems to the Court that the County's legal argument amounts to an after-the-fact, disingenuous attempt to "take back" a carefully reviewed and knowingly issued permit, simply because a political change of view had occurred. [Emphasis supplied].

In reviewing administrative decisions made and actions taken by County officials, the Board of Zoning Appeals had before it abundant evidence not only of the actions themselves

but of the reasons for them. We hold that the B.Z.A. did not commit error in rendering its decision on the basis of the reasons given by the County officials for their actions. *Cf. United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984); *Mortimer v. Howard Research & Development Corp.,* 83 Md.App. 432, 443, 575 A.2d 750, 755 (1990).

### B. The Pinpointing of Finality and the Significance, If Any, of Non–Finality

When the B.Z.A. granted West Shore its conditional use on February 10, 1994, or at the latest when it filed its opinion memorializing that grant on March 31, the B.Z.A. presumably had concluded its phase of the approval process. It then fell to the Planning Commission to give its approval to a site plan. The Planning Commission gave that approval on August 16.

The appellants then had to consider what, if any, strategies were available to tie up the approval process, pending the expected enactment of a new zoning ordinance by the County Council. The appellants waited a full thirty days from August 16 and then appealed the Site Plan approval to the B.Z.A., claiming that the Planning Commission had acted illegally in three regards. Rather than have the B.Z.A. act immediately, however, the appellants returned to the Planning Commission on September 20 and asked it to reconsider its Site Plan approval of August 16. One of the appellants, the Town of Sykesville, claimed that it wanted the chance to offer its comments on the Site Plan but had not had the opportunity to do so at the August meeting because of inadequate notice. When given the opportunity to make its comments at the September 20 meeting, the Town of Sykesville demurred, indicating that it was not yet prepared to do so and asked for a further delay of forty-five days in order to review the Plan and prepare its comments. The Planning Commission indicated that it would give the Town of Sykesville until October 18 to prepare and offer comments. The Planning Commission, in turn, requested that the B.Z.A. delay its hearing on the Site Plan Appeal until after the Planning Commission's meeting of October 18.

The B.Z.A. granted that request. It held its hearing and rendered its decision on October 26. In the meantime, the Town of Sykesville had filed yet another appeal to the B.Z.A., challenging the legality of the Planning Commission's decision, taken at the October 18 meeting, not to reconsider its August 16 approval of the Site Plan. That additional appeal somehow languished along the way. In any event, the appellants, as a legitimate tactic, were doing everything they could to slow down the approval process.

The question before us is that of how effectively the appellants succeeded in tieing up the process. Involved are two closely-related questions: 1) Did the very taking of the appeal to the B.Z.A. from the Planning Commission's Site Plan approval freeze that approval as something not yet final for the duration of the appeal? and 2) If so, how long did such a freeze of the approval remain in effect?

The answer to the first question is far from clear. Article 66B, § 4.07 sets out the power of the legislative body for a county to establish a board of appeals. Section 4.07(f) deals with the extent to which there is a stay of proceedings when an appeal is taken to a county board of appeals:

An appeal stays all proceedings in furtherance of the action appealed from, unless the officer from whom the appeal is taken certifies to the board of appeals after notice of appeal shall have been filed with him that by reason of the facts stated in the certificate a stay would, in his opinion, cause imminent peril to life or property. In such case proceedings shall not be stayed otherwise than by a restraining order which may be granted by the board of appeals or by a court of record on application on notice to the officer from whom the appeal is taken and on due cause shown.

Article 17.2 of the Carroll County Zoning Ordinance empowers the Board of Appeals "to adopt and promulgate such rules and regulations as it shall deem necessary in the conduct of its hearings." Pursuant to that section, the Board of Appeals enacted its Rules of Organization and Procedure. Section E–V of those Rules repeats *verbatim* the stay provi-

sions of Article 66B, § 4.07(f). It is that language on which the appellants rely for the proposition that the Site Plan approval was "stayed" pending the appeal to the B.Z.A.

The B.Z.A., however, had quite a different view on whether the Site Plan approval was even affected by the language in question. In rendering its decision on the West Shore appeal, the B.Z.A. gave its interpretation of the Article 66B, § 4.07(f) language and its inapplicability to something like a site plan approval:

In the board's view, there are two reasons why *this section is not applicable to the facts of this case.* First, *the language itself seems to contemplate that some type of enforcement action is stayed.* In other words, the term "proceedings" seems to contemplate some active effort by some administrative officer to accomplish something, *such as the issuance of a zoning violation notice to make a particular use cease. This fits in with the remaining language of the section* which allows the officer to prevent the proceedings from being stayed if he determines that there is some threat. *It is hard to see how this entire section applies to the approval of a site plan by the Planning Commission;* for example, it is hard to see how the exercise of rights under an approved subdivision plan or site plan is a "proceeding," or how the stay of action under a site plan could constitute some threat to the public welfare. The Board notes that *Section 4.07, as originally drafted and for many years thereafter, applied only to appeals from an enforcement officer, such as the Zoning Administrator, and not to appeals from the Planning Commission. Maryland–National Capital Park and Planning Comm'n v. City of Rockville,* 269 Md. 240, 305 A.2d 122 (1973); 64 *Op. Atty. Gen.* 349 (1979). In short, *the Board is of the view that approval of a site plan is not a "proceeding" which is stayed by an appeal to the Board,* at least based upon the facts of this matter. [Emphasis supplied].

In deferring to the B.Z.A.'s interpretation of the prevailing administrative practice, we are guided by *Dept. v. Reeders Memorial Home,* 86 Md.App. 447, 453, 586 A.2d 1295 (1991):

Upon appellate review, courts bestow special favor on an agency's interpretation of its own regulation. Recognizing an agency's superior ability to understand its own rules and regulations, a "court should not substitute its judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken." *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119 (1978).

In *Dept. of Human Resources v. Thompson*, 103 Md.App. 175, 189–90, 652 A.2d 1183 (1995), Judge Hollander quoted with approval that language from *Reeders* in the course of the following discussion:

Deference to the agency's findings is based upon the recognition of the agency's expertise.

. . .

*Reeders*, 86 Md.App. at 453, 586 A.2d 1295 (quoting *Bulluck*, 283 Md. at 513, 390 A.2d 1119). *See also, Hanson v. D.C. Rental Housing Comm'n*, 584 A.2d 592, 595 (D.C.App.1991) (Court of Appeals must defer to an agency's interpretation of its own regulations where that interpretation is reasonable); Kenneth Culp Davis & Richard J. Pierce, Jr., 1 *Administrative Law Treatise*, § 6.10 at 282 (3d ed.1994) (courts defer to agency interpretation of regulations because the agency typically is in a superior position to determine what it intended when it issued a rule).

*See also Baltimore Bldg. and Constr. Trades v. Barnes*, 290 Md. 9, 14–15, 427 A.2d 979, 981–82 (1981); *Holy Cross Hospital v. Health Ser.*, 283 Md. 677, 685, 393 A.2d 181, 185 (1978); *Fort Washington v. Dept.*, 80 Md.App. 205, 213, 560 A.2d 613, 617–18 (1989); *B & O Railroad v. Bowen*, 60 Md.App. 299, 305, 482 A.2d 921, 924 (1984).

If, indeed, any unresolved loose end, dangling somewhere, could preclude the finality of the site approval with fatal consequences to the vesting of West Shore's right to proceed, the appellants would not need to rely on the Site Plan Appeal. It would be enough for them to point to their largely forgotten appeal to the B.Z.A. from the Planning Commission's *refusal*

on October 18 *to reconsider* its August 16 approval of the Site Plan. As a matter of fact, in ruling that the building permit *had validly issued* and that West Shore's right to commence construction *had vested* and was therefore unaffected by the new ordinance, the Board of Zoning Appeals added an interesting final note:

> Nothing in this decision prevents the persons who filed *the second appeal of the site plan* from pursuing that appeal. The normal rule is that a person who undertakes work pending an appeal does so at his or her own risk but the effect of any possible successful appeal is not before the Board at this time. [Emphasis supplied].

Even recognizing that there might be loose ends yet unresolved, the B.Z.A. nonetheless treated the Site Plan approval as presumptively final and recognized the entitlement of County officials to proceed on the basis of that presumptive finality unless and until some appropriate reviewing authority declared otherwise. The process was not frozen in non-final status.

Our conclusion that the antecedent approval process was not flawed need not depend, however, on our deference to the B.Z.A.'s interpretation of whether an appeal to it stays or freezes the effect of the decision appealed from. Even if it were otherwise and the very taking of the appeal from the Planning Commission's approval of the Site Plan operated to freeze that approval as non-final, there remains the closely-related question of at what point such a freeze might come to an end.

In pushing their argument on the non-final status of the Site Plan approval, the appellants are a bit vague about the outer limits of non-finality. At the very least, they would like to defer finality from the time of the oral decision of the B.Z.A. to the time of the written decision of the B.Z.A. With almost the same breath, however, they seek to extend non-finality not only to the filing of the written decision but to some vague appeal period (presumably to the circuit court)

after the filing of a written decision. The appellants' brief charges:

With the Site Plan Appeal still unresolved, *inter alia,* the Official Decision by the BZA had not yet issued, and *the appeal periods for that decision had not yet run,* West Shore sought and obtained a building permit . . . [Emphasis supplied].

In reply brief, the appellants further charge:

Despite knowing that *the appeal period for the Site Plan Appeal . . . had not even begun* (as the Decision did not issue until November 22, 1994), Appellee rushed to finalize the building permit on Friday, October 28, 1994 . . . [Emphasis supplied].

They claim that a valid building permit could not have issued before the written BZA Decision, before the appeal period had even begun relative to the written BZA final Decision, and *before the appeal period had expired.* [Emphasis supplied].

In pushing for a time beyond the filing of the B.Z.A.'s written decision, the appellants seem to be hung up on the thirty-day period within which an appeal to the circuit court could be filed. They assert in their reply brief:

Had the Appellee waited until *the expiration of the Site Plan Appeal period (thirty (30) days after November 22,* 1994), Ordinance 122, enacted in the interim, would have prevented construction of the Tower. [Emphasis supplied].

It is this thirty-day filing period for an appeal that seems to have significance for them. Again, in the reply brief, they claim:

The Appellee asks the rhetorical question "Should West Shore have waited? If so, for how long?" The simple answer, from a vested rights standpoint, is that *the Appellee should have waited at least through the appeal period.* [Emphasis supplied].

There is neither law nor logic to support the appellants' position. By what possible rationale should Site Plan approval

remain in suspended animation during the thirty days in which an appeal to the circuit court could be filed but not continue in suspended animation if such an appeal were then timely filed, as it was by the appellants in this case. The actual filing of an appeal would have more significance than the mere possibility that an appeal still could and might be filed.

Would the appellants have the period of suspended animation continue until the circuit court had rendered its decision? If that decision were adverse, would suspended animation continue for another thirty days to permit the filing of an appeal to the Court of Special Appeals? If such an appeal were, indeed, filed, would the suspended animation continue until the decision had been rendered by this Court? If that decision were adverse, would the suspended animation continue through the *certiorari* process to the Court of Appeals or even the rendering of a final opinion by the Court of Appeals? For the appellants to declare, as an *ipse dixit*, that non-finality lasts until the filing of the B.Z.A.'s written decision *plus thirty days* makes no sense. Thirty days, whether an appeal is filed or not? Why thirty days?

The answer to the question, "Why thirty days?", appears to be that the appellants have grasped at an ambiguous *dictum* from *Relay v. Sycamore*, 105 Md.App. 701, 734, 661 A.2d 182, 198, *cert. granted, sub. nom. Sycamore Realty v. People's Counsel of Baltimore*, 341 Md. 30, 668 A.2d 422 (1995), that uses the phrase "before the expiration of an appeal period." Unfortunately, like icebergs in the North Atlantic sea lanes, there is a lot of dangerous *dicta* adrift in the zoning case law. The passage toward which the appellants would steer us is:

> Accordingly, the Court has consistently held that *a landowner who obtains a permit and begins construction before the expiration of an appeal period does not acquire a vested right* to proceed with construction. *See O'Donnell*, 289 Md. at 508, 425 A.2d 1003; *Long Meadow*, 264 Md. at 494–96, 287 A.2d 242; *Berwyn Heights*, 228 Md. at 279–80, 179 A.2d 712; *Lipsitz*, 164 Md. at 227–28, 164 A. 743. *Compare Permanent Financial*, 308 Md. at 250–52, 518 A.2d 123. [Emphasis supplied].

There is first the ambiguity. What "appeal period" is being discussed? Unlike Gertrude Stein's "rose," an appeal period is not an appeal period is not an appeal period. Does "appeal period" refer to 1) the time for filing an appeal or 2) the ongoing pendency of the appeal from (a) the Planning Commission to the B.Z.A., (b) the B.Z.A. to the circuit court, or (c) the circuit court to the Court of Special Appeals? Does the *dictum* use "appeal period" in the same sense as that for which the appellants cite it?

There is then the question of the substantive accuracy of the *dictum*. *Relay v. Sycamore* is a zoning estoppel case. It does not turn on a question of vested rights. It is not concerned with anything happening during an appeal period. In the course of an extensive and wide-ranging discussion, it utters the single sentence quoted above, ostensibly taking it from *O'Donnell v. Bassler,* 289 Md. 501, 508, 425 A.2d 1003, 1007 (1981). The other cases cited by *Relay v. Sycamore* for that sentence are simply the cases relied on, in its turn, by *O'Donnell v. Bassler.* The problem for the appellants is that the passage relied on from *O'Donnell v. Bassler* stands for a proposition of law diametrically opposite to that for which the appellants cite the *Relay v. Sycamore dictum.* The pertinent language from *O'Donnell v. Bassler,* 289 Md. at 508, 425 A.2d 1003, is:

> The issuance of a permit that is invalidated upon direct judicial review, however, creates no vested right in an owner. More particularly, an owner who obtains a permit and begins construction before the expiration of an appeal period proceeds at his own risk. [Citations omitted].

What *O'Donnell v. Bassler* says is that *if a landowner elects to proceed* with construction, knowing full well that "upon direct judicial review" a presumptively valid building permit may be invalidated and a presumptively vested right may be divested, *that landowner "proceeds at his own risk."* That is the exact opposite of the proposition being urged by the appellants. Their position is that a building permit, as a matter of law, *does not become valid* and that a zoning right,

as a matter of law, *does not vest* until the direct judicial review process has already been completed and that a landowner, therefore, as a matter of law, *cannot elect to proceed,* even at his own risk.

*O'Donnell v. Bassler* (and *Relay v. Sycamore* as well) rely on *City of Hagerstown v. Long Meadow,* 264 Md. 481, 494–96, 287 A.2d 242, 248–250 (1972). *Long Meadow* was an equitable estoppel case, not a vested rights case. It was held that erroneous advice given to a landowner by a zoning official of the City of Hagerstown, to the effect that a building permit was not even required, was legally wrong and would, therefore, estop the City of Hagerstown from proceeding against the landowner for a zoning law violation. The landowner made the point that it had incurred significant expense by relying on the advice of the zoning official. The Court of Appeals pointed out that a large part of that expense had been incurred between the time that the landowner got a favorable ruling at the circuit court level and the ultimately unfavorable ruling from the Court of Appeals. It was in this context that Judge Finan simply made the wry observation:

> *The apparent harshness of this ruling should be ameliorated* by the consideration that the major portion of expense incurred by Long Meadow was the result of the construction which it undertook while the decision of the lower court was pending review on appeal. Thus, *in a way, Long Meadow embarked on a calculated risk.* [Emphasis supplied].

264 Md. at 496, 287 A.2d 242. That was not a statement of any legal principle but only a passing observation to the effect that the owner's plight was, in a sense, self-inflicted.

The other two cases cited by *O'Donnell v. Bassler* (and by *Relay v. Sycamore* as well) are *Berwyn Heights v. Rogers,* 228 Md. 271, 279–80, 179 A.2d 712 (1962) and *Lipsitz v. Parr,* 164 Md. 222, 227–228, 164 A. 743 (1933). Both of those are equitable estoppel cases, not vested rights cases. Neither one of them, moreover, has anything remotely to do with, even by way of gratuitous discussion, rights vesting or not vesting or anything else happening during an appeal period. *Permanent*

*Financial Corp. v. Montgomery County,* 308 Md. 239, 250–52, 518 A.2d 123, 129–30 (1986), also cited by *Relay v. Sycamore,* was an equitable estoppel case that had nothing to do with anything happening during an appeal period. The law in this regard is simply not what the appellants represent it to be.

The appellants' lesser version of their "freeze" argument is that the taking of the Site Plan Appeal placed the Site Plan approval in a state of suspended animation at least for the duration of that appeal to the B.Z.A. They argue further that the Site Plan approval was not finalized by the B.Z.A.'s oral decision of October 26 but had to await the filing of its written opinion on November 22.

Ironically in view of their present position, the appellants themselves treated October 26 as the date on which the B.Z.A.'s decision in the Site Plan Appeal was final. They appealed that October 26 decision to the Circuit Court for Carroll County without waiting for the subsequent filing of a written opinion. No one has claimed that that appeal was premature.

We will, however, assume, *arguendo,* that the Site Plan approval, decided by the Planning Commission on August 16, was frozen in non-final form when, on approximately September 15, the appellants filed their Site Plan Appeal with the B.Z.A. We shall further assume that the "freeze" was not lifted when the formal vote of the B.Z.A. was taken on October 26 and recorded in its minutes. Even assuming that the finality of the Site Plan approval did not fully ripen until the B.Z.A.'s written opinion of November 22, the building permit issued on October 28 was not void but, at worst, only voidable if the B.Z.A. changed its mind before filing its written decision.

If between the Planning Commission's decision of August 16 and the B.Z.A.'s oral decision of October 26, West Shore had obtained a building permit and gone forward with construction (it did not), its position of peril or exposure was, we hold, that expressed by *O'Donnell v. Bassler,* 289 Md. 501, 508, 425 A.2d 1003, 1007 (1981), when it stated that "an owner who obtains a

permit and begins construction before the expiration of an appeal period proceeds at his own risk." Between August 16 and October 26, that risk would have been significant, for the B.Z.A. might well have decided the Site Plan Appeal a different way.

Following the oral decision of October 26 and the B.Z.A.'s written opinion on November 22, that risk would have been significantly diminished but not totally eliminated. There still remained the possibility that the B.Z.A. would, in whole or in part, change its mind and issue a written opinion that did not necessarily track the oral decision of October 26. The B.Z.A., however, did not change its mind and West Shore luckily came through its period of risk or exposure unscathed.

### *Conclusion*

The evidence supported the findings of the Board of Zoning Appeals that 1) construction had visibly and significantly commenced prior to the October 31 enactment of the new zoning ordinance, 2) the commencement of construction had been in good faith in that West Shore intended to continue with construction and to complete the job, and 3) that construction had commenced pursuant to a valid building permit. The Board of Zoning Appeals was, therefore, correct in ruling that West Shore's right had vested and was not affected by the new ordinance. Accordingly, we hold that Judge Burns was correct in affirming the decision of the Board of Zoning Appeals. Under the circumstances, West Shore's argument with respect to zoning estoppel is moot.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.*